IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEMODULATION, INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

1:11-cv-236-SGB

Judge Susan G. Braden

**MOTION OF THE UNITED STATES
TO DISMISS THE FIRST, SECOND, FOURTH AND FIFTH CAUSES OF ACTION
OF DEMODULATION'S FIRST AMENDED COMPLAINT**

TONY WEST
Assistant Attorney General

JOHN FARGO
Director

OF COUNSEL:

DOUGLAS T. HOFFMAN
Attorney
Department of Justice

GARY L. HAUSKEN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C.  20530
Telephone:     (202) 307-0342
Facsimile:     (202) 307-0345

September 16, 2011

# TABLE OF CONTENTS

I.     THE COURT LACKS JURISDICTION OVER THE CLAIMS IN COUNT I ................ 2

    A.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE CONTRACTS .......... 2

        1.    The Demodulation Nondisclosure Agreements Are Alleged
             to be with NNSA ..................................................................................... 3

        2.    The Cooperative Research and Development Agreement
             (CRADA) Provides A Remedy Only Against BWXT ............................. 5

        3.    The BWXT – Demodulation CRADA ....................................................... 7

    B.    DEMODULATION LACKS STANDING TO ASSERT A CLAIM REGARDING THE
        EXPENDITURES OF FUNDS ........................................................................... 8

    C.    DEMODULATION'S AVERMENTS REGARDING THE EXPENDITURES OF FUNDS
        FAIL TO STATE A CLAIM ............................................................................ 9

II.    COUNT II MUST BE DISMISSED AS IT ASSERTS AN IMPLIED-IN-LAW
     CONTRACT THAT IS NOT WITHIN THE COURT'S JURISDICTION .................... 10

    A.    THE NON-DISCLOSURE AGREEMENTS AND CRADA CANNOT SUPPORT
        IMPLIED-IN-FACT CONTRACT RECOVERY ............................................... 11

    B.    DEMODULATION SEEKS TO PROVE ONLY AN "IMPLIED-IN-LAW"
        CONTRACT, WHICH IS BEYOND THE COURT'S JURISDICTION ................................. 12

III.    COUNT IV MUST BE DISMISSED FOR LACK OF JURISDICTION AND/OR
      FAILURE TO STATE A CLAIM ................................................................. 13

    A.    THE COURT LACKS JURISDICTION AS TO DEMODULATION'S CLAIM FOR
        VIOLATION OF "SUBSTANTIVE AND PROCEDURAL DUE PROCESS PROVIDED
        BY THE FIFTH AMENDMENT AND ELSEWHERE IN THE CONSTITUTION" .................. 14

    B.    PATENT INFRINGEMENT CANNOT BE ASSERTED AS A FIFTH AMENDMENT
        CLAIM .................................................................................................... 15

    C.    MISAPPROPRIATION OF TRADE SECRETS CANNOT BE ASSERTED AS A FIFTH
        AMENDMENT CLAIM ............................................................................... 16

    D.    IN-Q-TEL IS NOT AN "INSTRUMENTALITY OF THE UNITED STATES" ..................... 16

    E.    PARAGRAPHS 65-74 OF THE AMENDED COMPLAINT FAIL TO STATE A CLAIM
        UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION ......................... 19

IV.     COUNT V MUST BE DISMISSED FOR LACK OF SUBJECT MATTER
        JURISDICTION ............................................................................................................ 21

V.      CONCLUSION................................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Arkansas v. Farm Credit Services of Cent. Ark.*,
520 U.S. 821 (1997) ............................................................................................ 17

*Ascroft v. Iqbal*,
129 S. Ct. 1937 (2009) ......................................................................... 9, 10, 19, 20

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................... 10, 20

*Butz Eng'g Corp.* v. *United States,*
499 F.2d 619 (1974) ........................................................................................... 18

*Carruth v. United States*,
627 F.2d 1068 (Ct. Cl. 1980) ............................................................................. 15

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ............................................................................. 3

*Chas. H. Tompkins Co. v. United States*,
230 Ct. Cl. 754 (1982) (Order) .......................................................................... 18

*City of El Centro v. United States*,
922 F.2d 816 (Fed. Cir. 1990) ..................................................................... 11, 12

*Conley v. Gibson*,
355 U.S. 41 (1957) ............................................................................................. 21

*Crozier v. Freid. Krupp Aktiengesellschaft*,
224 U.S. 290 (1912) ..................................................................................... 15, 16

*Eastport S.S. Corp. v. United States*,
372 F.2d, at 1008 (Ct. Cl. 1967) ....................................................................... 14

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
528 U.S. 167 (2000) ............................................................................................. 8

*Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*,
491 F.3d 320 (6th Cir. 2007). .......................................................................... 7

*Gould, Inc. v. United States*,
67 F.3d 925  (Fed. Cir. 1995) ............................................................................. 10

*Hancock v. Train*,
426 U.S. 167 (1976)................................................................................. 6

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996)............................................................................... 12

*Katz v. Cisneros*,
16 F.3d 1204 (Fed. Cir. 1994)................................................................. 8

*Keene Corp. v. United States*,
508 U.S. 200 (1993)............................................................................... 21

*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995)............................................................... 15

*Lebron v. National R.R. Passenger Corp.*,
513 U.S. 374  (1995)............................................................................. 17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................ 8

*McCulloch v. Maryland*,
17 U.S. (4 Wheat) 316 (1819)........................................................... 6, 17

*McNutt v. General Motors Acceptance Corp.*,
298 U.S. 178, 189 (1936)............................................................... 3, 7, 17

*Mezibov v. Allen*,
411 F.3d 712 (6th Cir. 2005) .................................................................. 4

*Mostowy v. United States*,
966 F.2d 668 (Fed. Cir. 1992)............................................................... 21

*Mullenberg v. United States*,
857 F.2d 770 (Fed. Cir. 1988)............................................................... 14

*O'Bryan v. Holy See*,
556 F.3d 361 (6th Cir. 2009) ................................................................. 4

*Perri v. United States*,
340 F.3d 1337 (Fed. Cir. 2003).............................................................. 13

*Radioptics, Inc. v. United States*,
621 F.2d 1113 ,(Ct. Cl. 1980) (per curiam) .......................................... 16

*Ransom v. United States*,
900 F.2d 242 (Fed. Cir. 1990)................................................................. 8

*Rick's Mushroom Service, Inc. v. United States*,
    521 F.3d 1338 (Fed. Cir. 2008)...................................................... 6

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ................................................................... 16

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) .................................................................. 9, 19

*Schillinger v. United States*,
    155 U.S. 163 (1894)................................................................. 15, 16

*Slattery v. United States*,
    635 F.3d 1298 (Fed. Cir. 2011) (en banc)...................................... 18

*Trauma Service Group v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997)................................................... 4, 11

*United States v. Amdahl Corp.*,
    786 F.2d 387 (Fed.Cir. 1986)................................................ 10, 12, 13

*United States v. Testan*,
    424 U.S. 392  (1976)................................................................... 14

*United Sur. &  Indem. Co. v. United States*,
    87 Fed. Cl. 580 (Fed. Cl. 2009) .............................................. 9, 10, 19

*White Mountain Apache Tribe v. United States*,
    8 Cl. Ct. 677 (1985) .................................................................... 3

*Zoltek Corp. v. United States*,
    442 F.3d 1345 (Fed. Cir. 2006) (per curiam),................................... 15

## **Statutes**

28 U.S.C. § 1491.................................................................... passim

28 U.S.C. § 1498(a) ....................................................................... 1

Const., Amend. V.................................................................... passim

Const., Amend. XIV §1 ................................................................. 15

# TABLE OF EXHIBITS

1.      Redacted Copy of Stevenson-Wydler Cooperative Research and
        Development Agreement No. Y-1207-0104 between BWXT Y-12 L.L.C.
        and Demodulation, Inc. ...................................................................................GA1

2.      LexisNexis Detailed Information Report of Records of the Delaware
        Secretary of State regarding In-Q-Tel, Inc. ................................................GA16

3.      In-Q-Tel, Inc. Corporate Fact Sheet ...........................................................GA18

4.      In-Q-Tel, Inc. webpage http://www.iqt.org/mission/our-aim.html.............................GA19

**MOTION OF THE UNITED STATES TO DISMISS
DEMODULATION'S COUNTS I (IN PART), II, IV AND V**

The United States, by its undersigned attorneys, hereby moves to dismiss Counts II, IV

and V of the First Amended Complaint, Docket No. 9, filed September 1, 2011 (Amended

Complaint) of Demodulation, Incorporated (Demodulation) for lack of subject matter

jurisdiction. Further, the United States moves to dismiss the alleged actions for breach of

contract regarding Babcock & Wilcox Technical Service Y-12, LLC (BWXT) [1] in Count I for

lack of subject matter jurisdiction and the alleged cause action in paragraph 41 of Count I for

lack of standing.

Count IV of the Amended Complaint, claiming violation of the Fifth Amendment, is

barred for several reasons. First, the Court's jurisdiction is limited to claims for "Takings" under

the Fifth Amendment, and therefore Demodulation's claims for "substantive and procedural due

process provided by the Fifth Amendment and elsewhere in the Constitution" are not actionable

in this Court. Second, the factual averments of paragraphs 65-74 fail to state a claim under the

Fifth Amendment of the Constitution. Third, the patent infringement and misappropriation of

trade secrets, alleged as a Fifth Amendment Taking in paragraph 66 of the Amended Complaint,

sound in tort and therefore are not within the Court's jurisdiction. [2] And fourth, In-Q-Tel is not

an "instrumentality of the United States" and therefore, its actions are not the actions of the

---

[1] The contractor is presently known as Babcock & Wilcox Technical Service Y-12, LLC and was previously known as BWXT Y-12, L.L.C. Regardless of the name used, the United States understands each of the allegations relating to "BWXT" refers to acts by the contractor who operates the Y-12 facility and not to government employees.

[2] The exclusive remedy for the unauthorized manufacture or use a patented invention lies under 28 U.S.C. § 1498(a), which is the subject of Count III of the Amended Complaint (¶¶ 55-64). Paragraph 66, however, appears to allege an alternative theory of liability for use of a patented invention, a theory that is barred by Supreme Court and Federal Circuit precedent. See Part III, *infra*.

United States.  Finally, Demodulation's Count V, claiming misappropriation of trade secrets, is barred because it sounds in tort and the Court has no jurisdiction over torts.

For the benefit of the Court, we address the allegations of fact relating to each cause of action in the discussion below.

# I.     THE COURT LACKS JURISDICTION OVER THE CLAIMS IN COUNT I

Count I of the Amended Complaint is not within the jurisdiction of the Court under 28 U.S.C. § 1491 because at least the CRADA is with BWXT and the non-disclosure agreements (Exhibits A & B, Amended Complaint) are not agreements with the Government.  Further, Demodulation lacks standing and this Court lacks jurisdiction over Demodulation's assertion that "DOE breached the terms of the CRADA and the implied covenant of good faith and fair dealing by spending federal funds to obtain a supply of Demodulation's microwire and Demodulation''s intellectual property and trade secrets" as stated in paragraph 41 of the Amended Complaint.

## A.     THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE CONTRACTS

Pursuant to the RCFC 12(b)(1), this Court must dismiss any claim if it determines that the Court lacks subject matter jurisdiction.  In Count I, Demodulation asserts breaches of three contracts:  breach of two "non-disclosure agreements" (NDAs) and breach of the Cooperative Research and Development Agreement (CRADA).[3]  Amended Compl., ¶¶ 8, 14, 38.  The two NDAs are alleged to be with the National Nuclear Security Administration (NNSA).  Amended Compl., ¶ 8.  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff always

---

[3] A redacted copy of the CRADA is attached as GA1-15.  The funding terms, statement of work and other appendices have been redacted, as Demodulation, Inc. may claim a proprietary interest in that information.  The parties have yet to reach an accord on an appropriate protective order.  The redacted copy of the CRADA is identical to Exhibit C to Demodulation's Amended Complaint. References to the CRADA throughout Defendant's motion to dismiss are to GA1-15.

bears the burden of establishing jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298

U.S. 178, 189 (1936); *White Mountain Apache Tribe v. United States,* 8 Cl. Ct. 677, 681 (1985).

As the Supreme Court stated in *McNutt*:

> The prerequisites to the exercise of jurisdiction are specifically defined and the plain import of the statute is that the [court] is vested with authority to inquire at any time whether these conditions have been met. They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. … [A]n inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence.

298 U.S. at 189. Because the reasons that this Court lacks jurisdiction are different for the NDA

with BWXT, the NDAs alleged to have been with the NNSA and the CRADA, we address each

category in turn.

### 1.    The Demodulation Nondisclosure Agreements Are Not with NNSA

Regarding the two NDAs attached as Exhibits A and B to Demodulation's Amended

Complaint, the Government challenges the factual basis for the allegation. *Cedars-Sinai Med.*

*Ctr. v. Watkins* 11 F.3d 1573, 1583 (Fed. Cir. 1993) ("If the Rule 12(b)(1) motion denies or

controverts the pleader's allegations of jurisdiction … the movant is deemed to be challenging

the factual basis for the court's subject matter jurisdiction").

As to the alleged NNSA Nondisclosure Agreements (NDAs), Demodulation states only that "Demodulation executed two confidentiality agreements with the NNSA whereby NNSA agreed that it would not 'disclose, publish or otherwise reveal any of the Confidential Information received from Demodulation to any other party whatsoever.'" Amended Compl., ¶ 8. This conclusory allegation fails to support subject matter jurisdiction. *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss," quoting *Mezibov v. Allen,* 411 F.3d 712, 716 (6th Cir. 2005)).

This singular paragraph fails to provide sufficient facts to establish a contract between the United States and Demodulation. It is beyond cavil, that the "party invoking jurisdiction has the burden" to demonstrate that the jurisdictional basis for its claim have been established. *Trauma Service Group v. United States*, 104 F.3d 1321, 1324 (Fed. Cir. 1997). The facts on the face of the NDA Exhibits fail to establish that the NNSA undertook a contractual obligation to Demodulation. The signatories of Exhibit A and B are labeled as "Contractor" throughout the NDA. For example, in Exhibit A to the Complaint, the purported signatory, "Loren D. Sivils," signs below the title "Insert *Contractor* Name here." Amended Compl. at page 20 (emphasis added). The only references to the "National Nuclear Security Administration" are found in section 9 of Exhibits A and B, sandwiched between generic references that call for a contractor's name and address, specifically "Insert Contractor Name" and "Contractor Address." Amended Compl. at pages 19 and 23. Section 9 of Exhibits A and B to the Amended Complaint describes how notices are handled under the NDA and only refers to a "contractor" with no apparent authority for the NNSA. Indeed, no address or authorized contact for the NNSA is provided throughout the NDA.

Finally, Demodulation makes no allegations regarding the signatories or the authority of each person to sign or otherwise establish an agreement or NDA between Demodulation and the NNSA. It only states the bare conclusion that the agreement is "with NNSA" and attaches Exhibits that on their face are only agreements between Demodulation and the signatories as contractors. Plaintiff's Amended Complaint fails to establish a contract with the United States as to the NDAs attributed to NNSA. Accordingly, Demodulation has failed to establish that the Court has jurisdiction over these contracts.

### 2. The Cooperative Research and Development Agreement (CRADA) Provides A Remedy Only Against BWXT

This Court lacks jurisdiction over the CRADA because the CRADA does not create any right for monetary damages against the United States. The CRADA includes the following provision:

ARTICLE XXVIII: DISPUTES

The Parties shall attempt to jointly resolve all disputes arising from this CRADA. If the Parties are unable to jointly resolve a dispute …, the dispute shall be decided by the DOE Contracting Officer, who shall reduce his/her decision to writing …. The DOE Contracting Officer shall mail or otherwise furnish a copy of the decision to the Parties. The decision of the DOE Contracting Officer is final unless, within 120 days, *the Participant brings an action for adjudication in a court of competent jurisdiction in the State of Tennessee.* To the extent that there is no applicable U.S. Federal law, this CRADA and performance thereunder shall be governed by the law of the State of Tennessee.

Exhibit at GA13-14.

Under the Tucker Act, the Court has "jurisdiction to render judgment upon any claim against the United States founded … upon any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). But not all contracts with the United States are within the Court's jurisdiction. The contract must provide a "substantive right to recover money damages" against the United States to establish jurisdiction under the Tucker Act. *Rick's Mushroom*

*Service, Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (Court lacked jurisdiction over breach of contract claim arising from a cost-share agreement that did not provide a substantive right to recover money-damages).

The CRADA states that it is a "Cooperative Research and Development Agreement … between BWXT Y-12, L.L.C. … and Demodulation, Inc." and is signed by those parties. GA1, GA15. Nothing suggests that the United States is a party to the CRADA. For example, the Government's contribution of funding is provided to BWXT through BWXT's contract with the Government. GA3, Article III, B.

And, as noted above, the Disputes clause indicates that the any dispute is to be in a Tennessee court. The Supremacy Clause (Const., Art. VI, cl. 2) provides that "the constitution and the laws made in pursuance thereof are supreme." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819). The effect of the Supremacy Clause is to "exempt [the Federal Government's] operations from [state] influence." *Id.* at 427; *Hancock v. Train*, 426 U.S. 167, 178 (1976). Therefore, absent consent of Congress, the Federal Government simply cannot be hailed into Tennessee court. And thus the Disputes clause of the CRADA, which governs all disputes between the contracting parties, must have been written with the understanding that the only entities that could be a party to any dispute would be BWXT and Demodulation, since it makes no provision for suits against the United States.

Demodulation understands that the Disputes clause of the CRADA governs, which is why it expressly states that this Court must assert jurisdiction by reading the Disputes clause out of the CRADA. Amended Compl., ¶40. Demodulation's allegation that "Article XXVII of the CRADA must be stricken from the CRADA because only the United States Court of Federal

Claims has jurisdiction over contract claims brought against the government" amounts to an erroneous legal conclusion that Demodulation asserts as a fact.

Importantly, no Government official signed the CRADA on behalf of the Government. *See* GA15. As is made clear in § 1491(a)(1) the contract must be one "with the United States." It is not sufficient that the contract is with a government contractor. *See Ransom,* 900 F.2d at 244; ("To maintain a cause of action pursuant to the Tucker Act … the contract must be between the plaintiff ...."); *Katz v. Cisneros*, 16 F.3d at 1210 (privity of contract is "the *sine qua non* of jurisdiction in the Court of Federal Claims…").

### 3.    The BWXT – Demodulation CRADA

Demodulation attempts to attribute the CRADA that it entered into with BWXT to the DOE by baldly asserting that the agreement was between Demodulation and DOE. Amended Compl., ¶¶ 7,13, 38. With respect to this agreement, the Government's jurisdictional challenge is facial. "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). "When reviewing a facial attack, a district court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." *Id.*

Accepting the allegations of Demodulation's amended complaint as true, this Court lacks subject matter jurisdiction as to the CRADA signed by BWXT. This Court's contract jurisdiction is defined by the Tucker Act, 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded … upon any express or implied contract with the United States …."). As is made clear in that section, the contract must be one "with the United States." It is not sufficient that

the contract is with a government contractor. *Ransom v. United States,* 900 F.2d 242, 244 (Fed. Cir. 1990); ("To maintain a cause of action pursuant to the Tucker Act …, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages ….") Privity of contract with the government is "the *sine qua non* of jurisdiction in the Court of Federal Claims[;] [a]bsent privity between [the claimant] and the government, there is no case." *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).

Contrary to Demodulation's bare allegations, DOE did not enter into a contract with Demodulation (Amended Compl., ¶¶ 7, 13, 38). Exhibit C of the Amended Complaint that Demodulation offers in support of its allegations states that the CRADA at issue is with BWXT, and this Court lacks subject matter jurisdiction as to the BWXT-Demodulation CRADA.

### B. DEMODULATION LACKS STANDING TO ASSERT A CLAIM REGARDING THE EXPENDITURES OF FUNDS

Demodulation also contends that "DOE breached the terms of the CRADA and implied covenant of good faith and fair dealing by spending federal funds to obtain a supply of Demodulation's microwire and Demodulation's intellectual property and trade secrets." Amended Compl., ¶ 41. Demodulation lacks standing to bring this claim.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 181-82 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *United Sur. & Indem. Co. v. United States,* 87 Fed. Cl.

580, 588 (Fed. Cl. 2009). Here, Demodulation has failed to show any injury, and therefore the inquiry is short.

Demodulation cannot claim an injury to others or "the public" to satisfy the standing requirements. *Friends of the Earth*, 528 U.S. 181 ("The relevant showing for purposes of Article III standing … is not injury to the environment but injury to the plaintiff"). Demodulation must establish an injury that Demodulation has suffered as a result of the alleged conduct. This it cannot do: since Demodulation alleges that it voluntarily sold the microwire to the Government, it therefore could not have suffered any loss from that alleged sale of the microwire,[4] it could not have been harmed even if procurement regulations were violated.

### C.  DEMODULATION'S AVERMENTS REGARDING THE EXPENDITURES OF FUNDS FAIL TO STATE A CLAIM

Demodulation contention that "DOE breached the terms of the CRADA … by spending federal funds to obtain a supply of Demodulation's microwire and Demodulation's intellectual property and trade secrets" (Amended Compl., ¶ 39) also fails to state a claim for which relief can be granted. On a motion to dismiss for failure to state a claim, all facts stated in the Complaint are assumed to be true unless contested and viewed in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). However, the Court need not accept the legal conclusions in the complaint when determining whether to dismiss for failure to state a claim. *Ascroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *see also United Sur. & Indem. Co.,* 87 Fed. Cl. at 588. Legal conclusions are only to be accepted where

---

[4] Here, we have accepted the allegation as being true for purpose of this motion to dismiss. However, on present information, the transaction involving the microwire will likely be a matter in dispute.

those conclusions are supported by the factual allegations. *Iqbal*, 129 S. Ct. at 1949-1950; *United Sur. & Indem.*, 87 Fed. Cl. at 588. Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S. Ct. at 1949-1950 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

Demodulation fails to state any harm that resulted from the breach alleged. The allegation is that the Government *paid* Demodulation in violation of government regulations. Demodulation does not explain, however, how it was harmed by the alleged sales in which it participated. This is the very type of "formulaic recitation of the elements" found to be impermissible in *Iqbal* and *Twombley*. *Iqbal*, 129 S. Ct. at 1950; *Twombley*, 550 U.S. at 555. Demodulation does nothing more than assert a perfunctory claim for damages, without any demonstrable showing that Demodulation was or could have been harmed.

## II. COUNT II MUST BE DISMISSED AS IT ASSERTS AN IMPLIED-IN-LAW CONTRACT THAT IS NOT WITHIN THE COURT'S JURISDICTION

Count II of the Amended Complaint asserts a cause of action for implied-in-fact Contract. Amended Compl., ¶ 51-54. The existence of an implied-in-fact contract is a separate basis of jurisdiction in the Court of Federal Claims. 28 U.S.C. § 1491; *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995). For example, "a contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid." *Id*. (citing *United States v. Amdahl Corp.*, 786 F.2d 387, 392-93 (Fed. Cir. 1986)). For example, even where a contract is unenforceable against the Government because it was "not properly advertised, not authorized," etc., the Government still must "pay for goods delivered or services rendered …" where it is clear that the Government benefited as a result of the unenforceable contract. *Gould*, 67 F.3d at 930. In this case, however, the Government was never a party to any agreement with

Demodulation, so Demodulation asks the Court to create a contract.  But the "party invoking jurisdiction has the burden" to demonstrate that the jurisdictional bases have been established, in this case an implied contract with the United States.  *Trauma Service Group*, 104 F.3d at 1324 .

A.    THE NON-DISCLOSURE AGREEMENTS AND CRADA CANNOT SUPPORT IMPLIED-IN-FACT CONTRACT RECOVERY

Neither the NDAs nor the CRADA were government contracts because those agreements, if enforceable at all, were between Demodulation and BWXT in the case of the CRADA and Demodulation and the signatories in the case of the NDAs.  As such, neither can be used to create a separate basis for jurisdiction in this Court.  In order prevail on Count II, Demodulation must establish that a distinct implied-in-fact contract was created between itself and the United States.  That it has not done.

Establishing the creation of "[a]n implied-in-fact contract requires findings of:  1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance" and "[w]hen the United States is a party, a fourth requirement is added:  the Government representative 'whose conduct is relied upon must have actual authority to bind the government in contract.'"  *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (citations omitted).  Demodulation's only attempt to meet these requirements is its conclusory allegation (Amended Compl., ¶ 52) that

> [a]n An implied in fact contract was created when Demodulation revealed trade secrets to the government thereby imposing on the government an obligation to maintain the confidentiality of Demodulation's trade secrets and to refrain from using the trade secrets for the government's benefit without providing compensation to Demodulation."

Demodulation provides no facts on which the Court could find an implied-in-fact contract.  An implied-in-fact contract requires a meeting of the minds and imputes a contract based on the clear intention of the parties as demonstrated through their conduct.  *Hercules, Inc.*

*v. United States*, 516 U.S. 417, 423 (1996). Demodulation claims only that it revealed its trade secrets to the Government. Amended Compl., ¶ 52. But that allegation cannot relieve Demodulation's burden to allege all of the *City of El Centro* factors. Even if such revelation could support the requirement for an unambiguous offer and acceptance, it certainly does not support requirements for mutuality of intent, consideration and a government representative with actual authority.

**B.     DEMODULATION SEEKS TO PROVE ONLY AN "IMPLIED-IN-LAW" CONTRACT, WHICH IS BEYOND THE COURT'S JURISDICTION**

To the extent that Demodulation asserts any cause of action, what it seeks appears to be based upon a theory of implied-in-law contract. However, the Court lacks jurisdiction to grant recovery for contracts implied-in law. *Hercules*, 516 U.S. at 423. At most, the terse allegations of the Amended Complaint (¶¶ 51-54) allow only an allegation of an implied-in-law contract, *i.e.*, a legal fiction imposed from a legal obligation to pay money or avoid unjust enrichment. *See Hercules*, 516 U.S. at 423. That Demodulation is asserting an implied-in-law contract becomes clear in paragraph 52 of the Amended Complaint. That paragraph asserts "[a]n implied in fact contract was *created* when Demodulation revealed trade secrets to the government *thereby imposing on the government an obligation* to maintain the confidentiality …." Amended Compl., ¶ 52 (emphasis added). A claim for relief based on a legal obligation is the hallmark of an implied-in-law contract.

While the Court has on occasion granted relief on the theory of *quantum valebant* or *quantum meruit*, that exception is a narrow one. Under either of those two theories of recovery, a contractor may receive the value of services provided to the government after an express contract is found to be void. See *Amdahl Corp.*, 786 F.2d at 393 . Such recovery, however, assumes that the parties had mistakenly believed that they entered a valid agreement. *Id.* In such

cases, the Court has allowed recovery but only where the intent of the parties was to enter a valid contract. *Id.* And the recovery has been limited to services rendered until the contract is declared void. *Id.* Of greater import, however, such recovery has been has been limited to cases where a contract existed between the parties. *Perri v. United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003) ("We know of no case … in which either [the Federal Circuit], the Court of Claims, or the Court of Federal Claims has permitted *quantum meruit* recovery in the absence of some contractual arrangement between the parties.").

But this is not such a case. Here, the Demodulation points to no express agreement between itself and the government that could form the basis for such a recovery, let alone an agreement approved by a government employee with the requisite authority to contract. Accordingly, Demodulation has not provided sufficient facts to establish a contract which could provide jurisdiction in this Court, and therefore its Count II must be dismissed.

## III. COUNT IV MUST BE DISMISSED FOR LACK OF JURISDICTION AND/OR FAILURE TO STATE A CLAIM

Count IV of the Amended Complaint asserts a cause of action for "violation of the Fifth Amendment." Amended Compl. at page 14. This cause of action fails for several reasons. First, Demodulation's requests for damages due to alleged violations of "substantive and procedural due process" are not within the Court's jurisdiction. Second, trade secret misappropriation and patent infringement are torts that are specifically excluded from the scope of 28 U.S.C. § 1491. Third, In-Q-Tel is not an instrumentality of the United States. And, finally, the facts set forth in support of Count IV in paragraphs 65-74 of the Amended Complaint fail to state a cause of action against the United States under the Fifth Amendment.

## A. THE COURT LACKS JURISDICTION AS TO DEMODULATION'S CLAIM FOR VIOLATION OF "SUBSTANTIVE AND PROCEDURAL DUE PROCESS PROVIDED BY THE FIFTH AMENDMENT AND ELSEWHERE IN THE CONSTITUTION"

Demodulation asserts "[t]he United States misappropriation of trade secrets and other property described above and its infringement of Demodulation's patents constitutes a violation of the Constitutional guarantees of substantive and procedural due process provided by the Fifth Amendment and elsewhere in the Constitution[5]." Amended Compl., ¶ 66. Demodulation further asserts that "In-Q-Tel rejected Demodulation without due process of law and in violation of laws governing the government's acquisition of property." Amended Compl., ¶ 73. Even assuming the factual averments in these paragraphs to be true, as we must on a motion to dismiss, Demodulation has failed to state a cause of action.

For Demodulation's "due process" claims to be heard in the Court of Federal Claims, those claims must be within 28 U.S.C. § 1491. As pertinent here, section 1491 states that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded … upon the Constitution … for liquidated or unliquidated damages in cases not sounding in tort…." (emphasis added). As indicated by section 1491's limitation to claims "for liquidated or unliquidated damages," the Court's jurisdiction to hear Constitutional claims is limited to provisions "mandating compensation by the Federal Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 398 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d, at 1008, 1009 (Ct. Cl. 1967) (internal quotes omitted); *see also Mullenberg v. United States*, 857 F.2d 770, 772-73 (Fed. Cir. 1988) (citing *Testan*); *Carruth v.*

---

[5] We presume that "elsewhere in the Constitution" refers to the Fourteenth Amendment, the only other provision relating to "due process." The Fourteen Amendment provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law." Const., Amend. XIV §1. That provision, of course, does not apply to actions of the Federal Government.

*United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980).  Specifically, the Federal Circuit has found that the Court of Federal Claims lacks jurisdiction over claims based on the due process clauses of the Fifth and Fourteenth Amendments because those clauses do not mandate the payment of money.  *LeBlanc v. United States,* 50 F.3d 1025, 1028 (Fed. Cir. 1995).  To be within the jurisdiction of the Court of Federal Claims, the count must seek the payment of money owed or wrongfully withheld as a matter of right.

Demodulation's claims that it was denied "due process" and protection of contracting law, not that some provision in the constitution mandates the payment of money to Demodulation.  And, as we have seen, the Supreme Court and the Federal Circuit have foreclosed the very claim that plaintiff makes here:  a violation of due process.

B.    PATENT INFRINGEMENT CANNOT BE ASSERTED AS A FIFTH AMENDMENT CLAIM

In *Zoltek Corp. v. United States*, 442 F.3d 1345 (Fed. Cir. 2006) (per curiam), the CFC permitted the plaintiff to allege patent infringement as a Fifth Amendment taking of property within the CFC's jurisdiction under 28 U.S.C. § 1491(a)(1).  442 F.3d at 1349.  The CFC had premised its decision on its belief that *Crozier v. Freid. Krupp Aktiengesellschaft*, 224 U.S. 290 (1912) had "effectively[,] … sub silentio," overruled an earlier Supreme Court decision, *Schillinger v. United States*, 155 U.S. 163 (1894).  *Schillinger* held that patent infringement was a "tort, pure and simple" and therefore specifically excluded by the Tucker Act's prohibition on "cases sounding in tort."  155 U.S. at 169; *cf.* 28 U.S.C. § 1491(a)(1)1 (current codification of Tucker Act).

In *Zoltek*, the Federal Circuit quickly dismissed the CFC's rationale that *Schillinger* had been overruled:  "The Court of Federal Claims, like this court, is bound by *Schillinger*, and the trial court rulings to the contrary are not viable."  442 F.3d at 1350.  Further, the Federal Circuit

noted, *Crozier* actually supported the opposite conclusion:  "In *Crozier* …, the Supreme Court … acknowledged Congressional recognition that the Court of Claims lacked Tucker Act jurisdiction over infringement under a takings theory.  442 F.3d at 1351.

Demodulation's claim, at paragraphs 65 and 66 of the Amended Complaint, that the alleged infringement of its patent constituted a taking of property is baseless.  Controlling decisions of the Supreme Court and Federal Circuit preclude Demodulation's claim.

### C.    MISAPPROPRIATION OF TRADE SECRETS CANNOT BE ASSERTED AS A FIFTH AMENDMENT CLAIM

The owner of a trade secret has a property interest in the trade secret.  *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003-04 (1984).  But misappropriation of a trade secret is a tort. *Radioptics, Inc. v. United States*, 621 F.2d 1113, 1130 (Ct. Cl. 1980) (per curiam).  Accordingly, the Court of Federal Claims lacks jurisdiction over claims of misappropriation of trade secrets. *Id.* (discussing the Court of Claims, predecessor to the Court of Federal Claims, and citing *Schillinger*).  As *Radioptics* makes clear, misappropriation of trade secrets is subject to *Schillerger'*s holding that the Tucker Act does not permit recovery of "cases sounding in tort" under a theory of a Constitutional "taking."

In light of *Radioptics* and *Schillinger*, Demodulations claims for damages in paragraphs 65 and 66 for a "taking" of Demodulation's "trade secret" are baseless and must be dismissed.

### D.    IN-Q-TEL IS NOT AN "INSTRUMENTALITY OF THE UNITED STATES"

At pargraphs 67-73 of the Amended Complaint, plaintiff sets out the predicate for its "Constitutional" claim.  The actor in most of the allegations is In-Q-Tel, and the only allegedly harmful actions are actions alleged to have been performed by In-Q-Tel.  Demodulation further alleges that "In-Q-Tel is an instrumentality of the United States Government and is operated with

federal funds pursuant to a charter between the CIA and In-Q-Tel." Comp. ¶ 68. This entire cause of action is therefore premised on In-Q-Tel being an "an instrumentality of the United States Government," such that its actions are attributable to the "United States" under 28 U.S.C. § 1491. If, however, Demodulation is incorrect – *i.e.*, if In-Q-Tel's actions are not attributable to the United States under § 1491 – then this Court lacks jurisdiction over the claim.

Demodulation bears the burden of demonstrating that In-Q-Tel falls within the definition of the "United States" for purposes of § 1491. *McNutt*, 298 U.S. at 189. In this instance, Demodulation must prove by a preponderance of the evidence that In-Q-Tel is an instrumentality that is within the definition of the "United States" for purposes of § 1491.

First, calling In-Q-Tel an "instrumentality of the United States" (a claim that is wholly conclusory), does not answer the question of whether In-Q-Tel is the "United States" for purposes of §1491, it only narrows the inquiry. Ever since *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819), the power of the United States to create "instrumentalities" to carry out it appointed functions has been beyond cavil. Many organizations are "instrumentalities of the United States." *See*, *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 386-392 (1995) (describing history of government corporations). But, "[a]n instrumentality of the United States can enjoy the benefits and immunities conferred by explicit statutes … without the further inference that the instrumentality has all of the rights and privileges of the National Government." *Arkansas v. Farm Credit Services of Cent. Ark.*, 520 U.S. 821 (1997) (instrumentalities of United States were not entitled to sue in Federal court to enjoin state taxation, although Federal government could maintain such a suit). In short, calling an entity an "instrumentality of the United States" does not indicate that the Congress has agreed that the entity shares all the rights and privileges of the national government.

The Government's liability for acts of the instrumentality must be determined by looking to the express authority conveyed to the "instrumentality" and any limitations on the grant of that status. *See*, *id.*, 520 U.S. at 830. The Federal Circuit's predecessor, the Court of Claims, clearly expressed the rule: "plaintiff must make a showing that the entity is functioning as an instrumentality of the United States." *Chas. H. Tompkins Co. v. United States*, 230 Ct. Cl. 754, 758 (1982) (Order). The Court went on to explain that, while the source of an instrumentality's funding may be relevant, it is only relevant if Congress intended to treat the entity as part of the national government: "it is well established that plaintiff must demonstrate that the contracting entity is 'one of those subsidiary instrumentalities for whose actions the United States … has renounced its *own* immunity,'" *Id.* at 756 (quoting *Butz Eng'g Corp.* v. *United States,* 499 F.2d 619, 622 (Ct. Cl. 1974)).[6] Thus, Demodulation must point to some statutory or other authority that waives the sovereign immunity of the United States with respect to the actions of In-Q-Tel.

A Lexis-Nexis search of the records of the Delaware Secretary of State on July 26, 2011 revealed that In-Q-Tel is a corporation organized under the laws of Delaware and has been registered and in good standing in that office since 1999. GA16-17. Further, In-Q-Tel's public statements do not suggest that it is an "instrumentality of the United States." For example a

---

[6] For clarity, we note that the Circuit's recent decision in *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc) is not relevant to the issue here. That decision abrogated the "non-appropriated fund instrumentality" doctrine, under which the Court of Federal Claims lacked jurisdiction over contracts of instrumentalities of the United States if the instrumentalities' obligations would not be paid out of Congressional appropriations. 635 F.3d 1307-09. As the *Slattery* court pointed out, even after abrogation of the nonappropriated fund instrumentality doctrine, "[t]he Tucker Act is not available when the breaching entity is not part of the federal government or not acting as its agent, or when jurisdiction has been explicitly disclaimed." 635 F.3d at 1307 n.3.

"Corporate Fact Sheet" (GA18) on In-Q-Tel's website[7] states that it is "a private, independent, not-for-profit organization." That claim is also repeated on the In-Q-Tel website in a page entitled "Our Aim."[8] GA19. According to these statements, In-Q-Tel is neither the United States nor an instrumentality of the government. It is simply a private not-for-profit corporation.

As pointed out at the beginning of this section, it is Demodulation's obligation to present sufficient evidence to establish this Court's jurisdiction by a preponderance of the evidence. It has not and cannot. Accordingly, Count IV must be dismissed.

### E.    PARAGRAPHS 65-74 OF THE AMENDED COMPLAINT FAIL TO STATE A CLAIM UNDER THE FIFTH AMENDMENT OF THE CONSTITUTION

As demonstrated above, the Court lacks subject matter jurisdiction over the alleged claims. But even if the Court were to address the contentions, Count IV must be dismissed for failure to state a claim. RCFC 12(B)(6).

On a motion to dismiss for failure to state a claim, all facts stated in the Complaint are assumed to be true unless contested and viewed in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). However, the Court need not accept the legal conclusions in the complaint when determining whether to dismiss for failure to state a claim. *Iqbal*, 129 S. Ct. at 1949 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *see also United Sur. & Indem. Co. v. United States,* 87 Fed. Cl. 580, 588 (Fed. Cl. 2009). Legal conclusions are only to be accepted where those conclusions are supported by the factual allegations. *Iqbal*, 129 S. Ct. at 1949-1950; *United Sur. & Indem.*, 87 Fed. Cl. at 588. Further, "[t]hreadbare recitals of the

---

[7]  Http://www.iqt.org/mission/IQT%20Corporate%20Fact%20Sheet.pdf (last visited June 3, 2011).

[8]  Http://www.iqt.org/mission/our-aim.html (last visited, June 3, 2011).

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949-1950 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

Here, the facts stated by Demodulation fail to state a cause of action under the Fifth Amendment that is within this Court's jurisdiction. While Count IV contains 70 paragraphs of allegations, most do not relate in any way to the allegations that form the basis of Count IV. Only paragraphs 66-74 address the alleged cause of action. Of those, paragraphs 68-70 are conclusory statements regarding the nature and activities of In-Q-Tel, not entitled to an assumption of truth. Paragraph 68, in particular, states legal conclusions not supported by any facts, and therefore are not entitled to be assumed true. Similarly, the contentions in paragraph 73 that Demodulation was rejected "without due process of law and in violation of laws governing the government's acquisition of property" are the type of "formulaic recitation of the elements" found to be wanting in *Iqbal* and *Twombley*. *Iqbal*, 129 S. Ct. 1950; *Twombley*, 550 U.S. 555.

Thus, after rejection of the conclusory allegations, Demodulation is left with the following facts in support of Count IV:

(a)  "At the direction of the CIA, Demodulation presented its technology to In-Q-Tel for [In-Q-Tel's] consideration whether to acquire microwire for the Government" (¶ 71);

(b)  "In-Q-Tel declined to either acquire Demodulation's technology for the government or to invest in Demodulation" (¶ 72); and

(c)  "In-Q-Tel rejected Demodulation …." (¶ 73).

These allegations fail to state a claim for which relief may be granted. Taken in the light most favorable to Demodulation, the allegations fail to claim even the "possibility" that the

Government is somehow responsible for any harm that may have befallen Demodulation. "[T]he complaint must be dismissed [because] 'plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Mostowy v. United States,* 966 F.2d 668, 672 (Fed. Cir. 1992) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## IV.  COUNT V MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

Count V asserts a claim for misappropriation of trade secrets. As noted above, misappropriation of a trade secret is a tort. *Radioptics*, 621 F.2d at 1130 ("misappropriation of a trade secret sounds in tort and is cognizable … only under the Federal Tort Claims Act," citing *Schillinger*). Section 1491 specifically excludes "cases sounding in tort" from the jurisdiction of the Court of Federal Claims. *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) ("tort cases are outside the jurisdiction of the Court of Federal Claims"); *Brown v. United States,* 105 F.3d 621, 623 (Fed. Cir. 1997) ("The Court of Federal Claims ... lacks jurisdiction over tort actions against the United States."). Accordingly, the Court of Federal Claims lacks jurisdiction over claims of misappropriation of trade secrets.

As demonstrated above, binding precedent holds that this Court lacks jurisdiction over claims of trade secret misappropriation. Demodulation provides no other basis for this Court to have jurisdiction over the trade secret misappropriation claim. Accordingly, Count V must be dismissed.

## V.  CONCLUSION

For the reasons stated, Demodulation's second, fourth and fifth counts must be dismissed for lack of jurisdiction. So much of Demodulation's first count as assert breaches of contracts for the NDAs and CRADA must be dismissed for lack of subject matter jurisdiction because the

contracts are not with the United States, and Demodulation has failed to present sufficient facts

to establish jurisdiction as to the remaining contract claims.  Finally, the allegations in paragraph

41 of Count I must be dismissed for lack of standing.


                                                    Respectfully submitted,

                                                    TONY WEST
                                                    Assistant Attorney General

                                                    JOHN FARGO
                                                    Director

                                                    *s/Gary L. Hausken*
OF COUNSEL:                                         GARY L. HAUSKEN
                                                    Assistant Director
DOUGLAS T. HOFFMAN                                  Commercial Litigation Branch
Attorney                                            Civil Division
Department of Justice                               Department of Justice
                                                    Washington, D. C.  20530
                                                    Telephone:    (202) 307-0342
                                                    Facsimile:    (202) 307-0345

September 16, 2011

# EXHIBITS

**TABLE OF EXHIBITS**

1.    Redacted Copy of Stevenson-Wydler Cooperative Research and
      Development Agreement No. Y-1207-0104 between BWXT Y-12 L.L.C.
      and Demodulation, Inc. ...............................................................................GA1

2.    LexisNexis Detailed Information Report of Records of the Delaware
      Secretary of State regarding In-Q-Tel, Inc. ...........................................GA16

3.    In-Q-Tel, Inc. Corporate Fact Sheet .......................................................GA18

4.    In-Q-Tel, Inc. webpage http://www.iqt.org/mission/our-aim.html.............................GA19

## STEVENSON-WYDLER (15 USC 3710)
## COOPERATIVE RESEARCH AND DEVELOPMENT
AGREEMENT (hereinafter "CRADA") No. Y-1207-0104_

between

### BWXT Y-12, L.L.C.
under its U.S. Department of Energy Contract No. DE-AC05-00OR22800
(hereinafter "Contractor")

and

### DEMODULATION, INC.
(hereinafter "Participant"),

both being hereinafter jointly referred to as the "Parties"

for

## TARGETED ASSESSMENT DETECTION AND MONITORING (TADAM)

## ARTICLE I:  DEFINITIONS

A.    "Government" means the United States of America and agencies thereof.

B.    "DOE" means the Department of Energy, an agency of the United States of America.

C.    "Contracting Officer" means the DOE employee administering the Contractor's DOE contract.

D.    "Generated Information" means information produced in the performance of this CRADA.

E.    "Proprietary Information" means information which embodies (i) trade secrets or (ii) commercial or financial information which is privileged or confidential under the Freedom of Information Act (5 USC 552 (b)(4)), either of which is developed at private expense outside of this CRADA and which is marked as Proprietary Information.

F.    "Protected CRADA Information" means Generated Information which is marked as being Protected CRADA Information by a Party to this CRADA and which would have been Proprietary Information had it been obtained from a non-federal entity.

G.    Subject Invention means any invention of the Contractor or Participant conceived or first actually reduced to practice in the performance of work under this CRADA.

H.    "Intellectual Property" means Patents, Trademarks, Copyrights, Mask Works, Protected

January 25, 2007

CRADA Information and other forms of comparable property rights protected by Federal Law and other foreign counterparts.

I. "Trademark" means a distinctive mark, symbol or emblem used in commerce by a producer or manufacturer to identify and distinguish its goods or services from those of others.

J. "Service Mark" means a distinctive word, slogan, design, picture, symbol or any combination thereof, used in commerce by a person to identify and distinguish its services from those of others.

K. "Mask Work" means a series of related images, however fixed or encoded, having or representing the predetermined, three-dimensional pattern of metallic, insulating or semiconductor material present or removed from the layers of a semiconductor chip product; and in which series the relation of the images to one another is that each image has the pattern of the surface of one form of the semiconductor chip product. (17 USC 901(a)(2)).

L. "RD&D" means research, development and demonstration performed by the Contractor and the Participant under this CRADA, including works performed by consultants or other contractors and subcontractors under this CRADA.

M. "Background Intellectual Property" means the Intellectual Property rights in the items identified by the Parties in Appendix C, Background Intellectual Property, which were in existence prior to or are first produced outside of this CRADA, except that in the case of inventions in those identified items, the inventions must have been conceived outside of this CRADA and not first actually reduced to practice under this CRADA to qualify as Background Intellectual Property. Licensing of Background Intellectual Property, if agreed to by the Parties, shall be the subject of separate licensing agreements between the Parties. Background Inventions are not Subject Inventions.

N. Foreign Interest is defined as any of the following:

    (1) A foreign government or foreign government agency;

    (2) Any form of business enterprise organized under the laws of any country other than the United States or its possessions;

    (3) Any form of business enterprise organized or incorporated under the laws of the United States, or a State or other jurisdiction within the United States, which is owned, controlled, or influenced by a foreign government, agency, firm, corporation or person; or

    (4) Any person who is not a U. S. citizen.

O. Foreign ownership, control, or influence (FOCI) means the situation where the degree of ownership, control, or influence over a participant by a foreign interest is such that a reasonable basis exists for concluding that compromise of classified information or

special nuclear material, as defined in 10 CFR Part 710, may result.

## ARTICLE II: STATEMENT OF WORK

Appendix A, Statement of Work, is hereby incorporated into this CRADA by reference.

## ARTICLE III: TERM, FUNDING AND COSTS

A.   The effective date of this CRADA shall be the latter date of (1) the date on which it is signed by the last of the Parties or (2) the date on which it is approved by DOE. The work to be performed under this CRADA shall be completed within twenty-four (24) months from the effective date.

B.   The Participant's estimated contribution is ▮▮▮▮ The Government's estimated contribution, which is provided through the Contractor's contract with DOE, is ▮▮▮▮ subject to available funding.

C.   Neither Party shall have an obligation to continue or complete performance of its work at a contribution in excess of its estimated contribution as contained in Article III B above, including any subsequent amendment.

D.   Each Party agrees to provide at least 60 days' notice to the other Party if the actual cost to complete performance will exceed its estimated cost.

## ARTICLE IV: PERSONAL PROPERTY

All tangible personal property produced or acquired under this CRADA (specifically excluding Intellectual Property rights, Background Intellectual Property, and Proprietary Information) shall become the property of the Participant or the Government, depending upon whose funds were used to obtain it. Such property is identified in Appendix A, Statement of Work. Personal property shall be disposed of as directed by the owner at the owner's expense. There shall not be any jointly funded property under this CRADA except by the mutual agreement of the Parties.

## ARTICLE V: DISCLAIMER

THE GOVERNMENT, THE PARTICIPANT, AND THE CONTRACTOR MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO THE CONDITIONS OF THE RESEARCH OR ANY INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE, OR DEVELOPED UNDER THIS CRADA, OR THE OWNERSHIP, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESEARCH OR RESULTING PRODUCT. NEITHER THE GOVERNMENT, THE PARTICIPANT, NOR THE CONTRACTOR SHALL BE LIABLE FOR SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES ATTRIBUTED TO SUCH RESEARCH OR RESULTING PRODUCT, INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT

January 25, 2007

**GA3**

MADE OR DEVELOPED UNDER THIS CRADA.

## ARTICLE VI: PRODUCT LIABILITY

Except for any liability resulting from any negligent acts or omissions of Contractor, Participant indemnifies the Government and the Contractor for all damages, costs and expenses, including attorney's fees, arising from personal injury or property damage occurring as a result of the making, using or selling of a product, process or service by or on behalf of the Participant, its assignees or licensees, which was derived from the work performed under this CRADA. In respect to this Article, neither the Government nor the Contractor shall be considered assignees or licensees of the Participant, as a result of reserved Government and Contractor rights. The indemnity set forth in this paragraph shall apply only if Participant shall have been informed as soon and as completely as practical by the Contractor and/or the Government of the action alleging such claim and shall have been given an opportunity, to the maximum extent afforded by applicable laws, rules, or regulations, to participate in and control its defense, and the Contractor and/or Government shall have provided all reasonably available information and reasonable assistance requested by Participant. No settlement for which Participant would be responsible shall be made without Participant's consent unless required by final decree of a court of competent jurisdiction.

## ARTICLE VII: OBLIGATIONS AS TO PROPRIETARY INFORMATION

A.    If Proprietary Information is orally disclosed to a Party, it shall be identified as such, orally, at the time of disclosure and confirmed in a written summary thereof, appropriately marked by the disclosing party, within ten (10) working days as being Proprietary Information.

B.    Each Party agrees to not disclose Proprietary Information provided by another Party to anyone other than the CRADA Participant and Contractor without written approval of the providing Party, except to Government employees who are subject to the statutory provisions against disclosure of confidential information set forth in the Trade Secrets Act (18USC 1905).

C.    All Proprietary Information shall be returned to the provider thereof at the conclusion of this CRADA at the provider's expense.

D.    All Proprietary Information shall be protected for a period of five (5) years from the date of execution of this CRADA, unless and until such Proprietary Information shall become publicly known without the fault of the recipient, shall come into recipient's possession without breach of any of the obligations set forth herein by the recipient, or shall be independently developed by recipient's employees who did not have access to such Proprietary Information.

E.    In no case shall the Contractor provide Proprietary Information of Participant to any person or entity for commercial purposes, unless otherwise agreed to in writing by such Participant.

4

January 25, 2007

# ARTICLE VIII: OBLIGATIONS AS TO PROTECTED CRADA INFORMATION

A.   Each Party may designate as Protected CRADA Information, as defined in Article I, any Generated Information produced by its employees and, with the agreement of the other Party, designate any Generated Information produced by the other Party's employees. All such designated Protected CRADA Information shall be appropriately marked.

B.   For a period of five (5) years from the date Protected CRADA Information is produced, Parties agree not to further disclose such Information except:

   (1)   as necessary to perform this CRADA;

   (2)   as provided in Article XI [REPORTS AND ABSTRACTS];

   (3)   as requested by the DOE Contracting Officer to be provided to other DOE facilities for use only at those DOE facilities with the same protection in place; or

   (4)   as mutually agreed by the Parties in advance, to comply with the requirements of reporting and filing Subject Inventions under Articles XIV and XVI.

C.   The obligations of (B) above shall end sooner for any Protected CRADA Information which shall become publicly known without fault of either Party, shall come into a Party's possession without breach by that Party of the obligations of (B) above, or shall be independently developed by a Party's employees who did not have access to the Protected CRADA Information.

# ARTICLE IX: RIGHTS IN GENERATED INFORMATION

The Parties agree that they shall have no obligations of non-disclosure or limitations on their use of, and the Government shall have unlimited rights in, all Generated Information, all Protected CRADA Information after the expiration of the period set forth in Article VIII (B) above and information provided to the Government or Contractor under this CRADA which is not marked as being copyrighted (subject to Article XIII) or as Protected CRADA Information (subject to Article VIII B) or Proprietary Information (subject to Article VII B), or which is an invention disclosure which may later be the subject of a U.S. or foreign patent application.

# ARTICLE X: EXPORT CONTROL

A.   THE PARTIES UNDERSTAND THAT MATERIALS AND INFORMATION RESULTING FROM THE PERFORMANCE OF THIS CRADA MAY BE SUBJECT TO EXPORT CONTROL LAWS AND THAT EACH PARTY IS RESPONSIBLE FOR ITS OWN COMPLIANCE WITH SUCH LAWS.

B.   The Participant has a continuing obligation to provide the Contractor written notice of any changes in the nature and extent of foreign ownership, control, or influence over the Participant which would affect the Participant's answers to the

previously completed FOCI certification.

## ARTICLE XI: REPORTS AND ABSTRACTS

A. The Parties agree to produce the following deliverables:

    (1) an initial abstract suitable for public release at the time the CRADA is approved by DOE;

    (2) other abstracts (final when work is complete, and others as substantial changes in scope and dollars occur);

    (3) a final report, upon completion or termination of this CRADA, to include a list of subject inventions;

    (4) a semi-annual signed financial report of the Participant's in-kind contributions to the project;

    (5) other topical/periodic reports where the nature of research and magnitude of dollars justify; and

    (6) computer software in source and executable object code format as defined within the Statement of Work or elsewhere within the CRADA documentation.

B. It is understood that the Contractor has the responsibility to provide the above information at the time of its completion to the DOE Office of Scientific and Technical Information.

C. Participant agrees to provide the above information to the Contractor to enable full compliance with paragraph B. of this Article.

D. It is understood that the Contractor and the Department of Energy have a need to document the long-term economic benefit of the cooperative research being done under this agreement. Therefore, the Participant acknowledges a responsibility to respond to reasonable requests, during the term of this CRADA and for a period of two (2) years thereafter from the Contractor for pertinent information.

## ARTICLE XII: PRE-PUBLICATION REVIEW

A. The Parties agree to secure pre-publication approval from each other which shall not be unreasonably withheld or denied beyond thirty (30) days.

B. The Parties agree that neither will use the name of the other Party or its employees in any promotional activity, such as advertisements, with reference to any product or service resulting from this CRADA, without prior written approval of the other Party.

## ARTICLE XIII:  COPYRIGHTS

A.  The Parties may assert copyright in any of their Generated Information.  Assertion of copyright generally means to enforce or give any indication of an intent or right to enforce such as by marking or securing Federal registration.

B.  Each Party shall have the first option to retain ownership of copyrights in works created as Generated Information by its employees.  Copyrights in jointly developed works shall be jointly owned.  If either Party decides not to retain ownership of copyright in a work created by its employee(s), that Party agrees to assign such copyright to the other Party, at the other Party's request.  Participant agrees to notify Contractor if it decides not to retain ownership of copyright in any work created by its employee(s); Contractor agrees to notify DOE if Participant or Contractor decide not to retain ownership of copyright in any work created by its employee(s).  The Parties agree to assign to DOE, upon request, copyrights not retained by either Party.

C.  For Generated Information, the Parties acknowledge that the Government has for itself and others acting on its behalf, a royalty-free, non-transferable, non-exclusive, irrevocable worldwide copyright license to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government, all copyrightable works produced in the performance of this CRADA, subject to the restrictions this CRADA places on publication of Proprietary Information and Protected CRADA Information.

D.  For all copyrighted computer software produced in the performance of this CRADA, the Party owning the copyright will provide the source code, an expanded abstract as described in Appendix B, the executable object code and the minimum support documentation needed by a competent user to understand and use the software to DOE's Energy Science and Technology Software Center, P.O. Box 1020, Oak Ridge, TN 37831.  The expanded abstract will be treated in the same manner as Generated Information in paragraph C of this Article.

E.  The Contractor and the Participant agree that, with respect to any copyrighted computer software produced in the performance of this CRADA, DOE has the right, at the end of the period set forth in paragraph B of Article VIII hereof and at the end of each two-year interval thereafter, to request the Contractor and the Participant and any assignee or exclusive licensee of the copyrighted software to grant a non-exclusive, partially exclusive, or exclusive license to a responsible applicant upon terms that are reasonable under the circumstances, provided such grant does not cause a termination of any licensee's right to use the copyrighted computer software.  If the Contractor or the Participant or any assignee or exclusive licensee refuses such request, the Contractor and the Participant agree that DOE has the right to grant the license if DOE determines that the Contractor, the Participant, assignee, or licensee has not made a satisfactory demonstration that it is actively pursuing commercialization of the copyrighted computer software.

Before requiring licensing under this paragraph E, DOE shall furnish the Contractor/Participant written notice of its intentions to require the Contractor/Participant

January 25, 2007

to grant the stated license, and the Contractor/Participant shall be allowed 30 days (or such longer period as may be authorized by the cognizant DOE Contracting Officer for good cause shown in writing by the Contractor/Participant) after such notice to show cause why the license should not be required to be granted.

The Contractor/Participant shall have the right to appeal the decision by the DOE to the grant of the stated license to the Invention Licensing Appeal Board as set forth in paragraphs (b)-(g) of 10 CFR 781.65, "Appeals".

F.     The Parties agree to place Copyright and other notices, as appropriate for the protection of Copyright, in human readable form onto all physical media, and in digitally encoded form in the header of machine readable information recorded on such media such that the notice will appear in human readable form when the digital data are off loaded or the data are accessed for display or printout.

## ARTICLE XIV: REPORTING SUBJECT INVENTIONS

A.     The Parties agree to disclose to each other each and maintain in confidence every Subject Invention, which may be patentable or otherwise protectable under the Patent Act sufficient to preserve U.S. and foreign filing rights as necessary.     The Parties acknowledge that the Contractor and Participant will disclose their respective Subject Inventions to the DOE within two (2) months after the inventor first discloses the Subject Invention in writing to the person(s) responsible for patent matters of the disclosing Party.

B.     These disclosures should be in sufficiently complete technical detail to convey a clear understanding, to the extent known at the time of the disclosure, of the nature, purpose and operation of the Subject Invention.    The disclosure shall also identify any known actual or potential statutory bars, i.e., printed publications describing the Subject Invention or the public use or on sale of the Subject Invention in this country. The Parties further agree to disclose to each other any subsequent known actual or potential statutory bar that occurs for a Subject Invention disclosed but for which a patent application has not been filed.    All Subject Invention disclosures shall be marked as confidential under 35 USC 205.

## ARTICLE XV:  TITLE TO SUBJECT INVENTIONS

Whereas the Participant and the Contractor have been granted the right to elect to retain title to Subject Inventions:

A.     Each Party shall have the first option to elect to retain title to any Subject Invention made by its employees.  If a Party elects not to retain title to any Subject Invention of its employees, then the other Party shall have the second option to obtain title by assignment of such Subject Invention.  The DOE shall retain title to any Subject Invention which is not retained by any Party.  Each Party shall have the option to elect to retain title to its undivided rights in any Subject Invention made jointly by employees of Contractor and employees of Participant.

8

January 25, 2007

B.   The Parties acknowledge that the DOE may obtain title to each Subject Invention reported under Article XIV for which a patent application or applications are not filed pursuant to Article XVI and for which any issued patents are not maintained by any Party to this CRADA.

C.   The Parties acknowledge that the Government retains a nonexclusive, nontransferable, irrevocable, paid-up license to practice or to have practiced for or on behalf of the United States every Subject Invention throughout the world.

D.   For a period of 1) up to six (6) months from the date of filing of any patent applications by Contractor or 2) up to six (6) months from the date of completion or termination of the CRADA, whichever period expires first, Participant has an option to choose, for reasonable compensation, a Sole Commercial Patent License Agreement with Contractor for any patents or patent applications resulting from Subject Inventions made in whole or in part by employees of Contractor. Such Sole Commercial Patent License Agreement shall be in the field of use of "cell phone or critical asset class detection". The U. S Competitive Clause shall apply to all such agreements.

## ARTICLE XVI: FILING PATENT APPLICATIONS

A.   The Parties agree that the Party initially indicated as having an ownership interest in any Subject Inventions (Inventing Party) shall have the first opportunity to file U.S. and foreign patent applications. If the Contractor or Participant does not file such applications within one year after election, then the other Party to this CRADA exercising an option pursuant to Article XV may file patent applications on such Subject Inventions. If a patent application is filed by the other party (Filing Party), the Inventing Party shall reasonably cooperate and assist the Filing Party, at the Filing Party's expense, in executing a written assignment of the Subject Invention to the Filing Party and in otherwise perfecting the patent application, and the Filing Party shall have the right to control the prosecution of the patent application. The Parties shall agree between themselves as to who will file patent applications on any joint Subject Invention. The Parties shall share equally in the costs for the prosecution, filing and maintenance of joint Subject Inventions where both Parties elect to retain title to their undivided rights.

B.   The Parties agree that DOE has the right to file patent applications in any country if neither Party desires to file a patent application for any Subject Invention. Notification of such negative intent shall be made in writing to the DOE Contracting Officer within three (3) months of the decision of the non-inventing party to not file a patent application for the Subject Invention pursuant to Article XV or not later than 60 days prior to the time when any statutory bar might foreclose filing of a U.S. patent application.

C.   A Party electing title or filing a patent application in the United States or in any foreign country shall advise the other Party and the DOE if it no longer desires to continue prosecution, pay maintenance fees, or retain title in the United States or any foreign country. The other Party and then the DOE will be afforded the opportunity to take title and retain the patent rights in the United States or in any such foreign country.

January 25, 2007

D.    Each Party agrees to provide the Project Manager of the other Party with a copy of each patent application it files on any Subject Invention.

## ARTICLE XVII:  TRADEMARKS

The Parties may seek to obtain Trademark/Service Mark protection on products or services generated under this agreement in the United States or foreign countries. The Parties hereby acknowledge that the Government shall have the right to indicate on any similar goods or services produced by or for the Government that such goods or services were derived from and are a DOE version of the goods or services protected by such Trademark/Service Mark with the Trademark and the owner thereof being specifically identified.  In addition, the Government shall have the right to use such Trademark/Service Mark in print or communications media.

## ARTICLE XVIII:  MASK WORKS

The Parties may seek to obtain legal protection for Mask Works fixed in semiconductor products generated under this agreement as provided by Chapter 9 of Title 17 of the United States Code. The Parties hereby acknowledge that the Government or others acting on its behalf shall retain a non-exclusive, paid-up, worldwide, irrevocable, non-transferable license to reproduce, import, or distribute the covered semiconductor product by or on behalf of the Government, and to reproduce and use the Mask Work by or on behalf of the Government.

## ARTICLE XIX: COST OF INTELLECTUAL PROPERTY PROTECTION

Each Party shall be responsible for payment of all costs relating to Copyright, Trademark and Mask Work filing, U.S. and foreign patent application filing and prosecution, and all costs relating to maintenance fees for U.S. and foreign patents hereunder which are solely owned by that Party.  Government/DOE laboratory funds contributed as DOE's cost share to a CRADA cannot be given to Participant for payment of Participant's costs of filing and maintaining patents or filing for Copyrights, Trademarks and Mask Works.

## ARTICLE XX:  REPORTS OF INTELLECTUAL PROPERTY USE

Participant agrees to submit, for a period of two (2) years and upon request of DOE, a non-proprietary report no more frequently than annually on efforts to utilize any Intellectual Property arising under the CRADA.

## ARTICLE XXI:  DOE MARCH-IN RIGHTS

The Parties acknowledge that the DOE has certain march-in rights to any Subject Inventions in accordance with 48 CFR 27.304-1(g).

January 25, 2007

## ARTICLE XXII: U.S. COMPETITIVENESS

The Parties agree that a purpose of this CRADA is to provide substantial benefit to the U.S. economy.

In exchange for the benefits received under this CRADA, the Participant therefore agrees to the following:

A.  Products embodying Intellectual Property developed under this CRADA shall be substantially manufactured in the United States;

B.  Processes, services, and improvements thereof which are covered by Intellectual Property developed under this CRADA shall be incorporated into the Participant's manufacturing facilities in the United States either prior to or simultaneously with implementation outside the United States. Such processes, services, and improvements, when implemented outside the U.S., shall not result in reduction of the use of the same processes, services, or improvements in the United States; and

C.  The Contractor agrees to a U.S. Industrial Competitiveness clause in accordance with its prime contract with respect to any licensing and assignments of its intellectual property arising from this CRADA, except that any licensing or assignment of its intellectual property rights to the Participant shall be in accordance with the terms of Paragraphs A. and B. of this Article.

## ARTICLE XXIII: ASSIGNMENT OF PERSONNEL

A.  It is contemplated that each Party may assign personnel to the other Party's facility as part of this CRADA to participate in or observe the research to be performed under this CRADA. Such personnel assigned by the assigning Party shall not during the period of such assignments be considered employees of the receiving Party for any purposes.

B.  The receiving Party shall have the right to exercise routine administrative and technical supervisory control of the occupational activities of such personnel during the assignment period and shall have the right to approve the assignment of such personnel and/or to later request their removal by the assigning Party.

C.  The assigning Party shall bear any and all costs and expenses with regard to its personnel assigned to the receiving Party's facilities under this CRADA. The receiving Party shall bear facility costs of such assignments.

## ARTICLE XXIV: FORCE MAJEURE

No failure or omission by Contractor or Participant in the performance of any obligation under this CRADA shall be deemed a breach of this CRADA or create any liability if the same shall arise from any cause or causes beyond the control of Contractor or Participant, including but not limited to the following, which, for the purpose of this CRADA, shall be regarded as beyond the

January 25, 2007

control of the Party in question: Acts of God, acts or omissions of any government or agency thereof, compliance with requirements, rules, regulations, or orders of any governmental authority or any office, department, agency, or instrumentality thereof, fire, storm, flood, earthquake, accident, acts of the public enemy, war, rebellion, insurrection, riot, sabotage, invasion, quarantine, restriction, transportation embargoes, or failures or delays in transportation.

## ARTICLE XXV: ADMINISTRATION OF THE CRADA

It is understood and agreed that this CRADA is entered into by the Contractor under the authority of its prime Contract with DOE. The Contractor is authorized to and will administer this CRADA in all respects unless otherwise specifically provided for herein. Administration of this CRADA may be transferred from the Contractor to DOE or its designee with notice of such transfer to the Participant, and the Contractor shall have no further responsibilities except for the confidentiality, use and/or non-disclosure obligations of this CRADA.

## ARTICLE XXVI: RECORDS AND ACCOUNTING FOR GOVERNMENT PROPERTY

The Participant shall maintain records of receipts, expenditures, and the disposition of all Government property in its custody related to the CRADA.

## ARTICLE XXVII: NOTICES

A.    Any communications required by this CRADA, if given by postage prepaid first class U.S. Mail or other verifiable means addressed to the Party to receive the communication, shall be deemed made as of the day of receipt of such communication by the addressee, or on the date given if by verified facsimile. Address changes shall be given in accordance with this Article and shall be effective thereafter. All such communications, to be considered effective, shall include the number of this CRADA.

B.    The addresses, telephone numbers and facsimile numbers for the Parties are as follows:

1.    **CONTRACTOR:**

a.    **FORMAL NOTICES AND COMMUNICATIONS, COPIES OF REPORTS**

Marilyn Giles
Manager, Office of Technology Transfer
Telephone: (865) 574-2214
Facsimile: (865) 241-4614
Email: gilesmh@y12.doe.gov

For Fedex, UPS, Freight:
BWXT Y-12, L.L.C.
Y-12 Plant, Bear Creek Road, Dock 47
Oak Ridge, TN 37830

January 25, 2007

For U. S. Mail Only:
BWXT Y-12, L.L.C.
P. O. Box 2009
Building 9737, MS 8091
Oak Ridge, TN 37831-8091

**b.** **TECHNICAL CONTACT, REPORTS, AND COPIES OF FORMAL NOTICES AND COMMUNICATIONS**

Paul DeMint
Telephone: (865) 576-7418
Facsimile: (865) 576-7649
E-mail : demintpd@y12.doe.gov

For Fedex, UPS, Freight:
BWXT Y-12, L.L.C.
Y-12 Plant, Bear Creek Road
Oak Ridge, TN 37830

For U. S. Mail Only:
BWXT Y-12, L.L.C.
P. O. Box 2009
Building 9202, MS 8204
Oak Ridge, TN 37831-8204

**2.** **PARTICIPANT**

**a.** **TECHNICAL CONTACT, REPORTS, AND FORMAL NOTICES AND COMMUNICATIONS**

Name: James E. O'Keefe, Jr.
President & CEO
Telephone: (201) 522-4720
Facsimile: (201) 666-0443
E-mail: jamesokeefe@optonline.net

For U. S. Mail, Fedex, UPS, Freight:
Demodulation, Inc.
121 Goodwin Terrace
Westwood, NJ 07675

## ARTICLE XXVIII: DISPUTES

The Parties shall attempt to jointly resolve all disputes arising from this CRADA. If the Parties are unable to jointly resolve a dispute within a reasonable period of time, the dispute shall be

decided by the DOE Contracting Officer, who shall reduce his/her decision to writing within 60 days of receiving in writing the request for a decision by either Party to this CRADA. The DOE Contracting Officer shall mail or otherwise furnish a copy of the decision to the Parties. The decision of the DOE Contracting Officer is final unless, within 120 days, the Participant brings an action for adjudication in a court of competent jurisdiction in the State of Tennessee. To the extent that there is no applicable U.S. Federal law, this CRADA and performance thereunder shall be governed by the law of the State of Tennessee.

## ARTICLE XXIX: ENTIRE CRADA AND MODIFICATIONS

A.  It is expressly understood and agreed that this CRADA with its Appendices contains the entire agreement between the Parties with respect to the subject matter hereof and that all prior representations or agreements relating hereto have been merged into this document and are thus superseded in totality by this CRADA.

B.  Any agreement to materially change any terms or conditions of this CRADA or the Appendices shall be valid only if the change is made in writing, executed by the Parties hereto, and approved by DOE.

## ARTICLE XXX: TERMINATION

This CRADA may be terminated by either Party upon thirty (30) days written notice to the other Party. This CRADA may also be terminated by the Contractor in the event of failure by the Participant to provide the necessary advance funding, as agreed in Article III.

In the event of termination by either Party, each Party shall be responsible for its share of the costs incurred through the effective date of termination, as well as its share of the costs incurred after the effective date of termination, and which are related to the termination. The confidentiality, use, and/or non-disclosure obligations of this CRADA shall survive any termination of this CRADA.

**FOR CONTRACTOR, BWXT Y-12, LLC:**

By:_____

Name:_____Willie Wilson_____

Title:_____Senior Contracts Manager_____

Date:_____12 Feb 07_____


**FOR PARTICIPANT, Demodulation, Inc.:**

By:_____

Name:_____James E. O'Keefe, Jr._____

Title:_____President and CEO_____

Date:_____3/23/07_____

January 25, 2007

**GA15**

**Delaware Secretary
of State Gateway**

This data is for information purposes only, certification can only be obtained through the Division of Corporations, or from a Delaware Registered Agent's office located within the State of Delaware.



Source Info

## *Detail Information*

**Date/Time of Results:** 07-26-2011 at 17:30

| | | |
|---|---|---|
| **File Number:** 3005957 | **Name Type:** Delaware Company | **Stock Co Flag:** |
| **Name:** IN-Q-TEL, INC. | | |
| **Kind:** Corporation Exempt | **Status:** Good Standing as of 05-07-2010 | **Tax Type:** A/R Filing Required |
| **Residency:** Domestic | **State of Incorp:** DE | **Country:** US |
| **Original Country:** | **Incorp/Qualify Date:** 02-17-1999 | **Foreign Incorporation Date:** |
| **Proclamation Date:** | **Renewal Date:** | **Expiration Date:** |
| **Bankruptcy Status:** | **Bankruptcy Date:** | **State:** |
| **Case Number:** | **Merged To:** | **State:** |
| **Federal ID:** 522149962 | **Quarterly Filing?:** | **Last Annual Report:** 2010 |
| **Registered Agent:** 9000010 | **Registered Agent County:** New Castle | |

THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON , DE19801

**Phone:** 302-658-7581

**Fax:** 302-655-2480

| Stock Information: | | | | | |
|---|---|---|---|---|---|
| **Amendment Number:** 000   **Effective Date:** 02-17-1999   **Effective Time:** 12:58 | | | | | |
| **Stock Seq Number** | **Description** | **Series** | **Class** | **Authorized** | **Par Value** |

| Filing History: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Seq Number** | **Filing Year** | **Doc Code** | **Doc Code Desc** | **Doc Pages** | **Dom Pages** | **Doc Filing Date** | **Doc Filing Time** | **Doc Effective Date** | **Doc Filing Status** | **Co Prev Name** | **Merger Type** |
| 1 | 2000 | 0240 | Amendment; Domestic | 1 | | 01-07-2000 | 12:31 | 01-07-2000 | | | |
| 2 | 2000 | 0240 | Amendment; Domestic | 1 | | 01-04-2000 | 11:15 | 01-04-2000 | | IN-Q-IT, INC. | |
| 3 | 1999 | 0240 | Amendment; Domestic | 1 | | 07-21-1999 | 11:00 | 07-21-1999 | | PELEUS, INC. | |
| 4 | 1999 | 0102 | Incorp Delaware Non-Stock | 7 | | 02-17-1999 | 12:58 | 02-17-1999 | | | |

| Tax Info: | | | | | | | |
|---|---|---|---|---|---|---|---|
| **As Of Date:** 07-26-2011 **Tax Balance:** .00 | | | | | | | |
| **Tax Year** | **Total Filing** | **Total Taxes** | **Total Penalty** | **Total Interest** | **Total Other** | **Total Paid** | **Total Balance** |
| 2011 | .00 | .00 | .00 | .00 | .00 | .00 | .00 |
| 2010 | 25.00 | .00 | .00 | .00 | .00 | 25.00 | .00 |

| 2009 | 25.00 | .00 | .00 | .00 | .00 | 25.00 | .00 |
|------|-------|-----|-----|-----|-----|-------|-----|

Go Back

Go Back to Search

About LexisNexis | Terms and Conditions | Change Password
Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Delaware graphic courtesy of The General Libraries, The University of Texas at Austin.

**GA17**



*About IQT*

In-Q-Tel is the strategic investment firm that works to **identify**, **adapt**, and **deliver** innovative **technology solutions** to support the missions of the Central Intelligence Agency and broader U.S. Intelligence Community (IC). Launched in 1999 as a private, independent, not-for-profit organization, IQT's mission is to identify and partner with companies developing cutting-edge technologies that serve the national security interests of the United States. Working from an evolving strategic blueprint defining the Intelligence Community's critical technology needs, IQT engages with entrepreneurs, growth companies, researchers, and venture capitalists to deliver technologies that provide superior capabilities for the CIA and the broader IC.

To date, IQT has reviewed **more than 7,500** business proposals, invested in **more than 165** companies, and delivered **more than 350** technology solutions to the U.S. Intelligence Community.

*Approach*

To optimize value for our client – the U.S. Intelligence Community – IQT engages with a range of companies from startups to established companies, as well as universities and research labs at a strategic level. We structure attractive win-win relationships through product development funding, equity investments, intellectual property arrangements and commercial and government business development guidance. All proceeds from investments made by IQT, a not-for-profit corporation, are reinvested into IQT operations, technologies, and programs to benefit the CIA, and the broader U.S. Intelligence Community as per IQT's charter agreement with the CIA.

*Focus*

We back great entrepreneurial teams with innovative technologies that have the potential to address high growth commercial markets. Commercial success for our partners is critical to achieving our ultimate goal of reducing the total cost of technology ownership to the Intelligence Community. But we are not looking for government-specific solutions. We focus on identifying commercial analogs to the IC's own enterprise problems where the needs of the market and the IC meet.

IQT concentrates on two broad commercial technology areas:

*Technology Priorities*

- **Information and Communication Technologies**
- **Physical and Biological Technologies**

Post Office Box 749, Arlington, Virginia, 22216 | Phone: (703) 248-3000 | Fax: (703) 248-3001 | www.iqt.org

**GA18**



*A C C E L E R A T I N G   I N N O V A T I O N   for the Intelligence Community*



**OUR AIM**

Launched in 1999 as an independent, not-for-profit organization, IQT was created to bridge the gap between the technology needs of the Intelligence Community (IC) and new advances in commercial technology. With limited insight into fast-moving private sector innovation, the IC needed a way to find emerging companies, and, more importantly, to work w th them. As a private company with deep ties to the commercial world, we attract and build relationships with technology startups outside the reach of the Intelligence Commun ty. In fact, more than 70 percent of the companies that IQT partners with have never before done business w th the government.

As a strateg c investor, we make investments in startup companies that have developed commercially-focused technologies that will provide strong, near-term advantages (within 36 months) to the IC miss on.  We design our strategic investments to accelerate product development and delivery, and specifically to help companies add capabilities needed by our customers in the Intelligence Community. Addit onally, IQT effectively leverages  ts direct investments by attracting a significant amount of private sector funds, often from top-tier venture capital firms, to co-invest in our portfolio companies. On average, for every dollar that IQT invests in a company, the venture cap tal community has invested over nine dollars, helping to deliver crucial new capabilities for lower cost to the government.

To learn more about our technology focus, cl ck here

• Delivered more than 300 technology solut ons

• Partnered with more than 150 companies

• Cultivated a network of more than 200 venture capital firms, and 100 labs and research organizat ons

• Reviewed more than 7,500 business plans

Copyright 2010 In-Q-Tel. All rights reserved.

**GA19**