IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEMODULATION, INC.

    Plaintiff,

       v.

THE UNITED STATES,

    Defendant.

1:11-cv-236-SGB

Judge Thomas C. Wheeler

**MOTION OF THE UNITED STATES FOR PARTIAL
SUMMARY JUDGMENT WITH RESPECT TO COUNT THREE
OF DEMODULATION'S THIRD AMENDED COMPLAINT**

STUART F. DELERY
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Assistant Director
Commercial Litigation Branch
Civil Division
 Department of Justice
Washington, D. C.  20530
Telephone:    (202) 307-0342
Facsimile:    (202) 307-0345

May 9, 2014

## TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ............................................................................................ 2

    A.    THE EXPIRED PATENTS ................................................................................. 2

    B.    UNITED STATES PATENT NO. 6,270,591 .................................................... 5

II.    REQUEST FOR JUDICIAL NOTICE OF USPTO RECORDS ....................................... 7

III.    ARGUMENT .................................................................................................................. 10

    A.    SUMMARY JUDGMENT ................................................................................. 10

    B.    THE ′085 AND ′693 PATENTS HAVE REACHED THE END OF THEIR TERMS AND EXPIRED ............................................................................... 11

    C.    DEMODULATION FAILED TO PAY MAINTENANCE FEES WHEN REQUIRED FOR THE ′297, ′411, ′905, ′879, ′771, ′417, ′439, ′249, ′645, AND ′166 PATENTS, AND THOSE PATENTS ALSO EXPIRED .................................... 13

    D.    DEMODULATION IS NOT THE OWNER OF THE ′591 PATENT ................... 14

        1.    The License Does Not Grant Demodulation the Right to Sue For Infringement ................................................................................... 17

        2.    Demodulation Lacks Several Other Substantial Rights ............................ 19

        3.    Demodulation has neither pleaded nor established that it is the equitable owner of the ′591 Patent ............................................................ 24

IV.    CONCLUSION ............................................................................................................... 24

*i*

# TABLE OF AUTHORITIES

**CASES**

*Abbott Laboratories v. Diamedix Corp.*,
    47 F.3d 1128 (Fed. Cir. 1995).........................................................................21

*Alfred E. Mann Found. for Scientific Res. v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010)..................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1985)........................................................................................11

*AsymmetRx, Inc. v. Biocare Medical, LLC*,
    582 F.3d 1314 (Fed. Cir. 2009)..........................................................16, 17, 18

*Blueport Co. v. United States*,
    533 F.3d 1374 (Fed. Cir. 2008)........................................................................14, 19

*Burandt v. Dudas*,
    528 F.3d 1329 (Fed. Cir. 2008)........................................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................10, 11

*Coast Federal Bank v. United States*,
    323 F.3d 1035 (Fed. Cir. 2003)........................................................................17

*Crown Die & Tool Co. v. Nye Tool & Machine Works*,
    261 U.S. 24 (1923)....................................................................................15, 16

*Dura Operating Corp. v. Magna Int'l*,
    2011 WL 869372 (E.D. Mich. 2011)................................................................13, 14

*E. W. Bliss Co. v. United States*,
    253 U.S. 187 (1920)........................................................................................14

*Enzo APA & Son, Inc. v. Geapag A.G.*,
    134 F.3d 1090 (Fed. Cir. 1998)........................................................................17

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
    442 F.3d 1301 (Fed. Cir. 2006)........................................................................11

*Foley Co. v. United States*,
    11 F.3d 1032 (Fed. Cir. 1993)........................................................................17

*Heinemann v. United States,*
  620 F.2d 874 (Ct. Cl. 1980) ................................................................... 15, 24

*In re Application of G,*
  11 U.S.P.Q.2d 1378 (Comm'r Pat.1989) ....................................................... 14

*In re Shell Oil Co.,*
  992 F.2d 1204 (Fed. Cir. 1993)................................................................... 7

*Israel Bio-Engineering Project v. Amgen, Inc.,*
  475 F.3d 1256 (Fed. Cir.  2007)................................................................. 16

*Jazz Photo Corp. v. International Trade Comm'n,*
  264 F.3d 1094 (Fed. Cir. 2001).................................................................. 17

*Jim Arnold Corp. v. Hydrotech Systems, Inc.,*
  109 F.3d 1567 (Fed. Cir.  1997)......................................................... 14, 18, 24

*Mars, Inc. v. Coin Acceptors, Inc.,*
  527 F.3d 1359 (Fed. Cir. 2008).................................................................. 15

*McAbee Const., Inc. v. United States,*
  97 F.3d 1431 (Fed. Cir. 1996)................................................................... 17

*Merck & Co., Inc. v. Kessler,*
  80 F.3d 1543 (Fed. Cir. 1996)............................................................... 11, 12

*Minkin v. Gibbons, P.C.,*
  680 F.3d 1341 (Fed. Cir. 2012).................................................................. 11

*Pratt & Whitney Co. v. United States,*
  153 F. Supp. 409 (Ct. Cl. 1957) ................................................................ 21

*Speedplay, Inc. v. Bebop, Inc.,*
  211 F.3d 1245 (Fed. Cir. 2000).................................................................. 19

*Standard Havens Products, Inc. v. Gencor Industries, Inc.,*
  897 F.2d 511 (Fed. Cir. 1990)................................................................... 7

*Standard Mfg. Co.  v. United States*, 42 Fed. Cl. 748, 779-781 (1999 ....................... 15

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,*
  944 F.2d 870 (Fed. Cir. 1991).................................................................. 20

*Vivid Tech., Inc. v. American Science & Eng'g, Inc.,*
  200 F.3d 795 (Fed. Cir. 1999)................................................................... 10

*Waterman v. Mackenzie,*
    138 U.S. 252 (1891) .................................................................................. 16, 19


**STATUTES**

28 U.S.C. § 1498 ......................................................................................... passim

31 U.S.C. § 3727 ................................................................................................. 15

35 U.S.C. § 120 ................................................................................................... 12

35 U.S.C. § 121 ................................................................................................... 12

35 U.S.C. § 154 ............................................................................................. 11, 12

35 U.S.C. § 261 ................................................................................................... 16

35 U.S.C. § 271 ................................................................................................... 15

35 U.S.C. § 365 ................................................................................................... 12

35 U.S.C. § 41 ..................................................................................................... 13

Uruguay Round Agreements Act,
    Pub. L. 103-465, 108 Stat. 4809 (Dec. 8, 1994) (URAA). ......................... 11, 12


**OTHER AUTHORITIES**

Fed. R. Evid. 201 ............................................................................................... 7, 8

RCFC 56 .............................................................................................................. 10

Robinson on Patents .......................................................................................... 15

# INDEX TO THE APPENDIX

1.      First Page of United States Patent No. 5,557,085 ........................................................GA1

2.      First Page of United States Patent No. 5,576,693 ........................................................GA2

3.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        6,018,297 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do...............GA3

4.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        6,137,411 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do...............GA4

5.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        6,225,905 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do...............GA5

6.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        6,232,879 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do...............GA6

7.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        6,417,771 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ..............GA7

8.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        7,071,417 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ..............GA8

9.      Screen Capture of Patent Bibliographic Data for United States Patent No.
        7,075,439 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ..............GA9

10.     Screen Capture of Patent Bibliographic Data for United States Patent No.
        7,233,249 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ............GA10

11.     Screen Capture of Patent Bibliographic Data for United States Patent No.
        7,354,645 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ............GA11

12.     Screen Capture of Patent Bibliographic Data for United States Patent No.
        7,368,166 obtained from https://ramps.uspto.gov/eram/patentMaintFees.do ............GA12

13.     Information relating to the assignment of United States Patent No. 6,270,591
        obtained from http://assignments.uspto.gov/assignments (Assignments on the
        Web).............................................................................................................................GA13

14.     Duly Authenticated Copy of the Records of the United States Patent and
        Trademark Office at Reel 9434, Frame 0803, recording the assignment, dated
        June 12, 1998, of a U.S. Patent Application, entitled "Amorphous and
        Nanocrystaline Glass-Covered Wires and Process for Their Production" from
        Horia Chiriac, Firuta Barariu, Adrian Tibor Ovari and Gheorghe Pop to the
        Institul de Fizica Tehnica ........................................................................................GA14

15.     First Page of United States Patent No. 6,270,591 B2 ................................................GA22

16.     License Agreement between the National Institute of Research and Development
        for Technical Physics and Demodulation, Inc., filed with the Court by
        Demodulation as part of Docket No. 25 on October 26, 2012 ....................................GA23

17.     Letter from Benjamin D. Light, counsel for Demodulation, Inc., to Jill Albaugh,
        Contracting Officer, National Nuclear Security Administration, Y-12 Site Office,
        dated June 29, 2012, with attached letter from Benjamin D. Light, counsel for
        Demodulation, Inc.,  to Christopher Barkley, Staff Director to the Minority, U.S.
        Senate Homeland Security and Governmental Affairs Committee, dated June 19,
        2012....................................................................................................................GA35

**MOTION OF THE UNITED STATES FOR PARTIAL
SUMMARY JUDGMENT WITH RESPECT TO COUNT THREE
OF DEMODULATION'S THIRD AMENDED COMPLAINT**

On September 10, 2012, the United States moved for summary judgment that six of the thirteen asserted patents had expired and, therefore, the United States was not liable to Demodulation, Inc. for any use of those patents after their expiration. Docket No. 22. In that motion, the United States also sought summary judgment that it was not liable to Demodulation for any use or manufacture of the inventions claimed in United States Patent No. 6,270,691 because Demodulation is not the owner of that patent. On July 12, 2013, the Judge Braden granted substantially all of the relief sought by the United States in its motion. Docket No. 29. Subsequently, the Court vacated that ruling. *Opinion & Order*, Docket No. 47 (Feb. 7, 2014).

The United States now renews its motion for summary judgment with respect to the lack of ownership of United States Patent No. 6,270,691 and the expiration of the other patents in suit. While the original motion was limited to six of the asserted patents, the passage of time has resulted in all of the patents expiring save the ′691 Patent, which the Government asserts is not owned by Demodulation. Accordingly, the United States hereby moves for partial summary judgment that the United States is not liable for any alleged manufacture or use of the inventions claimed United States Patents Nos. 5,557,085 (the ′085 Patent); 5,576,693 (the ′693 Patent); 6,018,297 (the ′297 Patent); 6,137,411 (the ′411 Patent); 6,225,905 (the ′905 Patent); 6,232,879 (the ′879 Patent); 6,417,771 (the ′771 Patent); 7,071,417 (the ′417 Patent); 7,075,439 (the ′439 Patent); 7,233,249 (the ′249 Patent); 7,354,645 (the ′645 Patent) and 7,368,166 (the ′166 Patent) after the expiration of each such patent, as set forth below. Each of the twelve identified patents has expired for nonpayment of maintenance fees or at the end of its term. Accordingly, summary judgment is appropriate with respect to any alleged manufacture or use occurring after the

expiration of these patents.  And, as in its prior motion, the United States also moves for partial

summary judgment that the United States is not liable to Demodulation for any manufacture or

use of any invention claimed in United States Patent No. 6,270,691 because Demodulation is not

the owner of that patent.

## I.    FACTUAL BACKGROUND

This motion relies almost exclusively on factual data that is publicly accessible from the

United States Patent and Trademark Office (PTO) or was provided by Demodulation.  First, the

PTO includes administrative data on the cover of each patent from which the term of the patent

can be determined.  Second, the PTO maintains a publically-accessible database, known as the

Revenue Accounting and Management (RAM) database.   That database is found at

https://ramps.uspto.gov/eram/patentMaintFees.do.  By entering the full patent and application

numbers, members of the public can obtain current data relating to the payment of maintenance

fees.  Finally, the PTO maintains records relating to the ownership of patents, referred to as the

"Patent Assignment Database" or "Assignments on the Web."  The remaining evidence, the

license agreement, was provided by Demodulation.

### A.        THE EXPIRED PATENTS

On May 5, 2014 the Government reviewed information available from the Patent and

Trademark Office.  That review indicated that twelve of the thirteen assert patents in this

litigation have expired, including ten that expired for failure to pay maintenance fees.

Specifically:

(*i*)     Patent No. 5,557,085 was issued on September 17, 1996 from Application No.

        08/256,487, and expired at the end of its term on September 17, 2013 (GA1);

(*ii*)     Patent No. 5,576,693 was issued on November 19, 1996 from Application No. 08/256,483, and expired at the end of its term on November 19, 2013 (GA2);

(*iii*)    Patent No. 6,018,297 was issued on January 25, 2000 from Application No. 08/737,761, and expired for non-payment of maintenance fees on January 25, 2012 (GA3);

(*iv*)    Patent No. 6,137,411 was issued on October 24, 2000 from Application No. 09/125,131, and expired for non-payment of maintenance fees on October 24, 2012 (GA4);

(*v*)     Patent No. 6,225,905 was issued on May 1, 2000 from Application No. 09/125,134, and expired for non-payment of maintenance fees on May 1, 2013 (GA5);

(*vi*)    Patent No. 6,232,879 was issued on May 15, 2001 from Application No. 09/367554, and expired for non-payment of maintenance fees on May 15, 2013 (A6);

(*vii*)   Patent No. 6,417,771 was issued on July 9, 2002 from Application No. 09/719,480, and expired for non-payment of maintenance fees on July 9, 2010 (GA7);

(*viii*)  Patent No. 7,071,417 was issued on July 4, 2006 from Application No. 10/972,549 and expired for non-payment of maintenance fees on July 4, 2010 (GA8);

(*ix*)    Patent No. 7,075,439 was issued on July 11, 2006 from Application No. 10/265,136 and expired for non-payment of maintenance fees on July 11, 2010 (GA9);

(x)     Patent No. 7,233,249 was issued on June 19, 2007 from Application No.

10/935,258 and expired for non-payment of maintenance fees on June 19, 2011

(GA10);

(xi)    Patent No. 7,354,645 was issued on April 8, 2008 from Application No.

10/746,784 and expired for non-payment of maintenance fees on April 8, 2012

(GA11); and

(xii)   Patent No. 7,368,166 was issued on May 7, 2008 from Application No.

11/098,052 and expired for non-payment of maintenance fees on May 7, 2012

(GA12).

As indicated, the first two patents expired at the end of their term, the remaining patents expired

as a result of the failure of Demodulation to pay maintenance fees.

Demodulation has filed four complaints in this case.  The original Complaint was filed on

April 14, 2011.  Docket No. 1.  On September 1, 2011, Demodulation filed its First Amended

Complaint.  Docket No. 9.  On May 4, 2012, Demodulation filed its Second Amended

Complaint.  Docket No. 19.  And, finally, Demodulation filed its Third Amended Complaint on

March 28, 2014.  Docket No. 52.  In each of the three complaints, Demodulation asserts that

"[d]ue to the wrongful acts of the Defendant and others, Demodulation has not been able to pay

the required registration [sic] fees required by the United States Patent and Trademark Office."

Compl, Docket No. 1 at ¶ 52; 1st Am. Compl., Docket No. 9 at ¶ 56; 2d Am. Compl., Docket

No. 19 at ¶ 56; 3d Am. Compl., Docket No. 52 at ¶ 80.   Thus, Demodulation has been aware for

over almost three years that some of its patents had already expired and others would expire

absent payment of the maintenance fees.  Compl, Docket No. 1 at ¶ 52; 1st Am. Compl., Docket

No. 9 at ¶ 56; 2d Am. Compl., Docket No. 19 at ¶ 56; 3d Am. Compl., Docket No. 52 at ¶ 80.

4

But Demodulation took no action to pay the maintenance fees when due, or at any time after

expiration.  Compl, Docket No. 1 at ¶ 52; 1st Am. Compl., Docket No. 9 at ¶ 56; 2d Am.

Compl., Docket No. 19 at ¶ 56; 3d Am. Compl., Docket No. 52 at ¶ 80.

### B.   UNITED STATES PATENT NO. 6,270,591

United States Patent No. 6,270,591 (the ′591 Patent) was issued to Horia Chiriac, Firuta

Barariu, Adrian Tibur Ovari and Gheorghe Pot, all residents of Romania.  GA22.  The ′591

Patent was issued on August 7, 2001.  GA22.  The ′591 Patent and the assignment records of the

PTO indicate that the ′591 Patent is assigned to Institutul de Fizica Tehnica of Iasi, Romania.

GA13-GA22.  Attached as an exhibit are assignment records of the PTO for the ′591 Patent.

GA13-GA21.  No further assignments of the ′591 patent are reported in the PTO's assignment

database.

Demodulation has never alleged that it owns the '591 patent.  Complaint, Docket No. 1 at

¶ 2; 1st Am. Complaint, Docket No. 9 at ¶ 2; 2d Am. Compl. Docket No. 19 at ¶¶ 2 & 56.

Demodulation alleges that it has "held" the patents at issue.  Complaint, Docket No. 1 at ¶ 2; 1st

Am. Complaint, Docket No. 9 at ¶ 2; 2d Am. Compl. Docket No. 19 at ¶¶ 2 & 56.

On July 3, 2012, Demodulation filed a claim under the Contract Disputes Act as order by

this Court in its *Memorandum Opinion and Order Regarding Defendant's Motion to Dismiss*,

Docket No. 15 at 14 (Feb. 29, 2012).  GA34-GA41.  As part of its submission to the Contracting

Officer, Demodulation included a letter that Benjamin D. Light submitted to Christopher

Barkley, Staff Director to the Minority, U.S. Senate Homeland Security and Governmental

Affairs Committee, Permanent Subcommittee on Investigation, 340 Dirksen Senate Office

Building, Washington, DC 20510.  GA36-GA41.

In the letter to Mr. Barkley, Mr. Light asserts:

Demodulation started this odyssey in 2002 by licensing the exclusive worldwide rights to U.S. and foreign patents for the composition and manufacture of microwire from the Romanian National Institute of Research and Development for Technical Physics and its director and inventor of the technology, Dr. Horia Chiriac.

GA37.

The USPTO also maintains a database of patent assignments. The records of the USPTO show that United States Patent No. 6,270,591 (the '591 Patent) was issued to Horia Chiriac, Firuta Barariu, Adrian Tibur Ovari and Gheorghe Pot, all residents of Romania. GA13, GA22. The initial application was filed in Romania pursuant to the Patent Cooperation Treaty. GA22. The Patent was issued on August 7, 2001. GA22.   The assignment records of the PTO indicate that the '591 Patent is assigned to the Institutul de Fizica Tehnica of Iasi, Romania (the Institute of Technical Physics or the Institute). GA13-GA21.  The Government has obtained a duly authenticated copy of the assignment from the PTO for the '591 patent. GA14-GA21.  No further assignments of the '591 patent are reported in the PTO's assignment database.

Earlier in this litigation, Demodulation filed *Demodulation's Opposition to the United States' Motion for Partial Summary Judgment and in Support of Its Cross-Motion for Discovery and Its Contingent Cross-Motion to Further Amend the Complaint*, Docket No. 25 (October 26, 2012).  Attached to that motion was a copy of the agreement between Demodulation and the Institute.  GA23-GA33.

The agreement is denominated as a "License" and the parties are referred to as the "Licensor" and "Licensee." GA23-GA33.  The license is described as a "terminable, royalty-bearing, exclusive license … limited to the LICENSED AREA." GA25, ¶ 2.1.  Further, the Licensor reserved "an irrevocable, royalty-free right to practice" the licensed invention and have that invention practiced for it.  GA25, ¶ 2.2.  The license also was limited to a term of years, with

renewal periods, and with a right to terminate that could be exercised by Demodulation.  GA25, ¶ 3.1.

Under the agreement, Demodulation was required to achieve practical application of the invention within twelve months of April 10, 2002.  GA26, ¶ 4.1.  Thereafter, royalties were to be calculated as a percentage of sales and were to be accounted for and paid twice annually.  GA26-GA27, ¶¶ 5.1 – 5.3 & 6.1-6.2.  The Institute has the right to audit Demodulation's records.  GA28, Article 7.

Further, either party could terminate the license under certain conditions.  GA29-GA30, Article 9.  In particular, the Institute could terminate if Demodulation failed to achieve practical application of the invention within the twelve month period, or if Demodulation "failed or will fail to reduce [the invention] to practice." GA29, ¶ 9.5(a) & (b).  The license also provides for termination due to Demodulation's insolvency or bankruptcy.  GA29, ¶¶ 9.6 & 9.7.

## II.   REQUEST FOR JUDICIAL NOTICE OF USPTO RECORDS

A court may take judicial notice of adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).   Judicial notice is appropriate at any stage of the proceedings.  Fed. R. Evid. 201(f).  If requested by a party requests judicial notice supported by the necessary information from which the fact can be determined, and after adequate notice and opportunity to be heard, the Court "shall take judicial notice."  Fed. R. Evid. 201(d).

The public records of a government agency's actions are "adjudicative facts" not subject to reasonable dispute.  *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990); *see also In re Shell Oil Co.*, 992 F.2d 1204, 1207 n.3 (Fed. Cir. 1993).  Here, the PTO maintains a publicly-available database that can be searched to determine whether

maintenance fees have been paid.  The PTO's Revenue Accounting and Management (RAM) database constitutes the type of public record that is subject to judicial notice under Fed. R. Evid. 201.  The data presented in this motion was obtained by proceeding to the PTO's RAM Maintenance Fee webpage at https://ramps.uspto.gov/eram/patentMaintFees.do on May 5, 2014. The current maintenance fee status of each patent is obtained by entering the patent number and application number (the entries cannot include commas, slashes or other non-numerical characters).  Pages 1 through 10 of the Appendix to this motion are reproductions of the "bibliographic data" available from the PTO's RAM database for each expired patent.  Each exhibit clearly states the expiration date of the patent, as indicated in the records of the PTO.  As such, the expiration dates cannot reasonably be questioned, and judicial notice is appropriate.

The United States requests that the Court take judicial notice the following facts:

(*i*)     Patent No. 5,557,085 was issued on September 17, 1996 from Application No. 08/256,487, which claimed priority to a 1992 Swedish application (GA1);

(*ii*)    Patent No. 5,576,693 was issued on November 19, 1996 from Application No. 08/256,483, which claimed priority to a 1992 Swedish application (GA2);

(*iii*)   Patent No. 6,018,297 was issued on January 25, 2000 from Application No. 08/737,761, and expired for non-payment of maintenance fees on January 25, 2012 (GA3);

(*iv*)    Patent No. 6,137,411 was issued on October 24, 2000 from Application No. 09/125,131, and expired for non-payment of maintenance fees on October 24, 2012 (GA4);

(*v*)     Patent No. 6,225,905 was issued on May 1, 2000 from Application No. 09/125,134, and expired for non-payment of maintenance fees on May 1, 2013 (GA5);

(*vi*)    Patent No. 6,232,879 was issued on May 15, 2001 from Application No. 09/367554, and expired for non-payment of maintenance fees on May 15, 2013 (GA6);

(*vii*)   Patent No. 6,417,771 was issued on July 9, 2002 from Application No. 09/719,480, and expired for non-payment of maintenance fees on July 9, 2010 (GA7);

(*viii*)  Patent No. 7,071,417 was issued on July 4, 2006 from Application No. 10/972,549 and expired for non-payment of maintenance fees on July 4, 2010 (GA8);

(*ix*)    Patent No. 7,075,439 was issued on July 11, 2006 from Application No. 10/265,136 and expired for non-payment of maintenance fees on July 11, 2010 (GA9);

(*x*)     Patent No. 7,233,249 was issued on June 19, 2007 from Application No. 10/935,258 and expired for non-payment of maintenance fees on June 19, 2011 (GA10);

(*xi*)    Patent No. 7,354,645 was issued on April 8, 2008 from Application No. 10/746,784 and expired for non-payment of maintenance fees on April 8, 2012 (GA11); and

(*xii*)    Patent No. 7,368,166 was issued on May 7, 2008 from Application No.

11/098,052 and expired for non-payment of maintenance fees on May 7, 2012

(GA12); and

(*xiii*)    the entire right, title and interest in United States Patent Application No.

09/101,006 was assigned by Horia Chiriac, Firuta Barariu, Adrian Tibor Ovari, and Gheorghe

Pop to the Institute of Technical Physics on June 12, 1998.  GA14-GA19.  That Application

subsequently issued as United States Patent No. 6,270, 591 B2 on August 7, 2001. GA22.

## III.    ARGUMENT

### A.    SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  RCFC 56(c). "The

burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary

judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (J. White, concurring).  This

burden consists of two components:  "An initial burden of production, which shifts to the

nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which

always remains on the moving party."  *Id.*

"When the moving party does not have the burden of proof on the issue that is the subject

of the … motion (the patentee bears the burden of proving infringement) the movant nonetheless

bears the initial burden of coming forward with sufficient evidence to demonstrate that there is

no material issue of fact … and that it is entitled to judgment as a matter of law."  *Vivid Tech.,*

*Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 806 (Fed. Cir. 1999).  Once the moving

party has come forward has demonstrated the absence of a genuine issue of material fact, the

burden shifts to the nonmoving party.  *Celotex*, 477 U.S. at 321.  The nonmoving party must

designate "specific facts" establishing a genuine issue for trial to avoid summary judgment.  *Id.*
at 324.  A plaintiff "must present affirmative evidence in order to defeat a properly supported
summary judgment motion."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985).  The
party who bears the ultimate burden of proof at trial, bears the burden on summary judgment of
demonstrating a disputed material fact exists regarding this essential element of its case.  *Minkin
v. Gibbons, P.C.*, 680 F.3d 1341 (Fed. Cir. 2012) ("[U]under the regular evidentiary burdens of
Rule 56, [plaintiff] had 'to introduce evidence sufficient to establish an issue of material fact as
to patentability.'").

    "One of the principal purposes of the summary judgment rule is to isolate and dispose of
factually unsupported claims …."  *Celotex*, 477 U.S. at 323-24.  Thus, the Supreme Court, in
*Celotex*, found that where the plaintiff bears the burden of proof, a defendant does not need to
produce evidence showing the absence of a genuine issue of material fact in order to properly
support its summary judgment motion.  *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d
1301, 1308 (Fed. Cir. 2006).  Rather, it is enough for the defendant to simply point to the failings
of the plaintiff's proof.  *Id.*, 442 F.3d at 1309.

    **B.**    **THE ′085 AND ′693 PATENTS HAVE REACHED THE END OF THEIR TERMS
AND EXPIRED**

    Figuring the term of the ′085 and ′693 Patents is not a straightforward exercise.  Both
patents are affected by changes to 35 U.S.C. § 154 enacted in the Uruguay Round Agreements
Act, §§ 532, 534, Pub. L. 103-465, 108 Stat. 4809 (Dec. 8, 1994) (URAA).  The Federal Circuit
has explained that the "purpose of the URAA was not to extend patent terms, although it has that
effect in some cases, but to harmonize the term provision of United States patent law with that of
our leading trading partners which grant a patent term of 20 years from the date of filing of the
patent application."  *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996).  For

purposes of the discussion here, the URAA became effective on June 8, 1995.  *See* URAA, §

534.  "Prior to June 8, 1995, [ ] patents had an expiration date under [ ] § 154 measured as 17

years from the date the patent issued…." *Merck & Co.*, 80 F.3d at 1547.  After passage of the

URAA, the term "begin[s] on the date on which the patent issues and end[s] 20 years from the

date on which the application for the patent was filed in the United States or, if the application

contains a specific reference to an earlier filed application or applications under section [35

U.S.C. §§] 120, 121, or 365(c) [ ], from the date on which the earliest such application was

filed."  35 U.S.C. § 154(a)(2) (1994).

However, "for pending applications which were filed prior to June 8, 1995, a transitional

provision preserves a guaranteed 17–year term, if it is longer than 20 years from filing." *Merck

& Co.*, 80 F.3d at 1547; URAA § 532.  That provision is now codified at 35 U.S.C. § 154(c)(1).

The ′085 and ′693 Patents fall into this category.

In each instance, the patent application was filed prior to June 8, 1995, but the patent

issued after that date.  GA1 (Blocks 30 & 45); GA2 (Blocks 30 & 45).  And, in each case, the

patent application claims priority to the same Swedish application (No. 9200145), filed on

January 20, 1992.  GA1 (Block 30); GA2 (Block 30).  Thus, the application fall with the scope of

§ 154(c)(1) and § 365(c).  Counting from the filing of Swedish priority application, the URAA

20-year term would expire on January 20, 2012 for both the  ′085 Patent and the ′693 Patent.

However, the prior "17-years from issue" term results in the ′085 Patent expiring on September

17, 2013 and the ′693 Patent expiring on November 19, 2013.  GA1 (Block 45); GA2 (Block 45).

Even using the "17-years from issue" calculation, however, both the ′085 Patent and ′693

Patent have now expired.  Demodulation is not entitled to seek compensation for any use of the

′085 patent after September 17, 2013 and for the ′693 Patent after November 19, 2013.

### C.   DEMODULATION FAILED TO PAY MAINTENANCE FEES WHEN REQUIRED FOR THE ′297, ′411, ′905, ′879, ′771, ′417, ′439, ′249, ′645, AND ′166 PATENTS, AND THOSE PATENTS ALSO EXPIRED

During the life of a patent, the owner is required to pay maintenance fees in order to preserve the exclusive rights granted by the patent.  35 U.S.C. § 41(b) & (c).  Section 41, subsections (b) and (c) provide for the payment of those fees.  The maintenance fees are required to be paid no later than 3½, 7½, and 11½ years after the date the patent issued.  35 U.S.C. § 41(b)(1).  Section 41 also provides a 6-month grace period for payment of the maintenance fees.  35 U.S.C. § 41(b)(2).  Thus, the maintenance payments must be made by the end of the grace period – *i.e.*, by the fourth, eighth, and twelfth anniversaries from issue.  35 U.S.C. § 41(b)(2).

The owner of a patent is obligated to pay "maintenance fees" to retain the exclusive rights that the patent grants.  35 U.S.C. § 41(b); *Dura Operating Corp. v. Magna Int'l*, 2011 WL 869372 at *8 (E.D. Mich. 2011).  If the owner fails to pay any of the maintenance fees by the dates required in the statute, the patent expires.  35 U.S.C. § 41(c); *Dura Operating*, 2011 WL 869372 at *8.

There is no question that the ′297, ′411, ′905,  ′879, ′771, ′417, ′439, ′249, ′645, and ′166 Patents have expired and that Demodulation was fully aware that its patents were expiring.  The records of the PTO establish the expiration of each patent, as shown in the attached exhibits.  And Demodulation said in its original Complaint that it was aware and reiterated that fact in each of its amended complaints.  *See Burandt v. Dudas*, 528 F.3d 1329, 1335 (Fed. Cir. 2008) (plaintiff's knowledge that the legal owner of patents had let three of plaintiff's other patents expire for nonpayment of maintenance fees belied plaintiff's claim that the non-payment was "unavoidable").  Where, as here, the owner makes a deliberate choice to allow a patent to expire for nonpayment of maintenance fees, the expiration is intentional and the patent cannot be

13

revived. *Dura Operating*, 2011 WL 869372 at *8 (citing *In re Application of G*, 11 U.S.P.Q.2d

1378, 1380 (Comm'r Pat.1989) (decision not to respond to office action was an intentional

abandonment of the application)).

As demonstrated above, the records of the Patent and Trademark Office, of which this

Court can take judicial notice, establish that ten of the thirteen Demodulation patents at issue in

this litigation—the ′297, ′411, ′905,  ′879, ′771, ′417, ′439, ′249, ′645, and ′166 Patents —have

expired.  Accordingly, as to those patents, Demodulation cannot establish any right to recover

after the expiration date of each patent.

### D.    DEMODULATION IS NOT THE OWNER OF THE ′591 PATENT

For the Court to have jurisdiction, Demodulation must establish that it is the "owner" of

the ′591 Patent.  28 U.S.C. § 1498.  The plaintiff must allege facts that demonstrate that it owns

the patent rights on which the infringement suit is based.  *Jim Arnold Corp. v. Hydrotech

Systems, Inc.,*109 F.3d 1567, 1571 -1572 (Fed. Cir.  1997) (apply 35 U.S.C. § 271).  And the

"allegation of ownership must have a plausible foundation."  *Id.*   This is particularly true in the

case of claims made under 28 U.S.C. § 1498, because that section is a waiver of sovereign

immunity and must be strictly construed in favor of the Government.  *Blueport Co. v. United

States*, 533 F.3d 1374, 1378 (Fed. Cir. 2008).  Section 1498(a) by its terms limits recovery to the

"owner" of a patent.

The Supreme Court noted that an "owner" for purposes of § 1498 "must have at least

such an interest in the patent as … would support such a suit against a defendant other than the

United States."  *E. W. Bliss Co. v. United States*, 253 U.S. 187, 192-93 (1920).  The general rule

as to who may bring an infringement suit against a party other than the Government was stated in

*Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 40-41 (1923) (quoting 3

Robinson on Patents § 937):

> With a single exception the plaintiff in an action at law must be the person
> or persons in whom the legal title to the patent resided at the time of the
> infringement.  An infringement is an invasion of the monopoly created by the
> patent, and the law which defines and authorizes this monopoly confers only upon
> its legal owners the right to institute proceedings for its violation.  These owners
> are the patentee, his assignee, his grantee, or his personal representatives; and
> none but these are able to maintain an action for infringement in a court of law.
> Moreover, the injury inflicted by an act of infringement falls upon the individual
> who owns the monopoly at the date of the infringement.  It does not affect former
> owners whose interest had terminated before the infringement was committed, nor
> does it so directly prejudice a future owner that the law can recognize his loss and
> give him a pecuniary redress.  Hence the plaintiff must not only have a legal title
> to the patent, but must have also been its owner at the time of the infringement.

The Supreme Court's quotation of Robinson refers to a "single exception" and that exception

> arises where an assignment of a patent is coupled with an assignment of a right of
> action for past infringements.  In this case the present owner of the monopoly may
> institute proceedings for its violation during the ownership of his assignor as well
> as for infringements committed since the transfer of the title to himself.

*Crown Die*, 261 U.S. at 41 (quoting 3 Robinson on Patents § 937).  This exception is not

applicable to the United States because the Assignment of Claims Act, 31 U.S.C. § 3727,

"renders void, as to the United States, assignment of an unliquidated claim against the

United States."  *Standard Mfg. Co.  v. United States*, 42 Fed. Cl. 748, 779-781 (1999).

Thus, an "owner" for purposes of § 1498 must be either "the holder of record title" to the

patent at issue, or "[a]t a minimum, … the person equitably entitled to the rights in the patent."

*Heinemann v. United States*, 620 F.2d 874, 877-878 (Ct. Cl. 1980).  This is consistent with the

law relating patent infringement claims under 35 U.S.C. § 271 where "[o]nly a patent owner or

an exclusive licensee can … bring an infringement suit; a non-exclusive licensee [can]not."

*Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367-68 (Fed. Cir. 2008).   And even an

exclusive licensee "ordinarily must join the patent owner." *AsymmetRx, Inc. v. Biocare Medical,*

*LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009).  While "a bare licensee, who has no right to exclude others from making, using, or selling the licensed products, has no legally recognized interest that entitles it to bring or join an infringement action."  *Id.*, 582 F.3d at 1319.

To be sure, a patent owner may assign ownership in the patent to another.  *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007).   "Under long established law, a patentee or his assignee may grant and convey to another: (1) the whole patent, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and throughout a specified part of the United States."  *Id.*  Where only an undivided share of the exclusive right is transferred, the assignee cannot sue in its name, but only jointly with the assignor.  *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).  Further, patents may only be assigned in writing.  35 U.S.C. § 261.

And "the plaintiff in an [infringement] action ... must be the person or persons in whom the legal title to the patent resided at the time of the infringement").  *Crown Die*, 261 U.S. at 40.  Thus, Demodulation must also have the right to enforce the patents in suit at the time the alleged infringement occurred.

 Section 261 further provides that "[a]n assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage."  Thus, an assignee has good reason to record his assignment:  absent recordation, the assignee is in danger of losing his interest should the prior owner re-convey the patent, either nefariously or by accident.

Here, the records of the USPTO, the owner of the ′591 Patent is the Institutul de Fizica Tehnica of Iasi, Romania.  GA13-GA21.  There are no other recorded assignments for ′591

16

Patent.   And Demodulation has not alleged that it is the owner of the ′591 Patent.  The most that

Demodulation alleges in its Third Amended Complaint is that it "possessed certain commercial

and property rights to certain patented and unpatented inventions."  3d Am. Compl. ¶ 2.   But,

Demodulation has not identified any document by which it was assigned any interest in the ′591

Patent nor does it even allege that it is an owner of the ′591 Patent.  Nor has it indicated

specifically what interest in the ′591 Patent that it has "possessed."

Demodulation acknowledges that it has an agreement to use the ′591 Patent.  But that

contract is not sufficient to allow Demodulation to enforce the ′591 Patent against the United

States.  *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998).

Licenses, like all contracts, are interpreted as a matter of law.  *Jazz Photo Corp. v.*

*International Trade Comm'n*,  264 F.3d 1094, 1108 (Fed. Cir. 2001) ("Determinations of express

or implied license or contract are matters of law"). The interpretation begins "with the language

of the written agreement." *Coast Federal Bank v. United States*, 323 F.3d 1035, 1038 (Fed. Cir.

2003) (citing *Foley Co. v. United States*, 11 F. 3d 1032, 1034 (Fed. Cir. 1993)).  If the provisions

are clear and unambiguous, the terms must be given their ordinary meaning without resort to

extrinsic evidence to interpret them.  *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435

(Fed. Cir. 1996).  And the agreement must be "considered as a whole and interpreted so as to

harmonize and give reasonable meaning to all of its parts." *Coast Federal*, 323 F.3d at 1038.

### 1.    The License Does Not Grant Demodulation the Right to Sue For Infringement

The Federal Circuit has stated "that the exclusive right to sue is 'particularly dispositive'

in cases where [the court is] deciding whether a patent owner must be joined as a party."

*AsymmetRx*, 582 F.3d at 1319.  "[A] bare licensee, who has no right to exclude others from

making, using, or selling the licensed products, has no legally recognized interest that entitles it

17

to bring or join an infringement action." *Id.*  Significantly, Demodulation's license agreement makes no provision for infringement actions.  The license agreement does not grant Demodulation a right to sue for infringement, nor does it grant Demodulation any share of infringement damages of the agreement.

The silence of the license agreement in regard to infringement is consistent with the granting of only a license, rather than an assignment.  Here, the Institute retained the right to practice and "to have practiced" the patented invention and license improvements containing "new matter."  GA25, ¶ 2.2; GA24, definition of "Licensed Patent." Accordingly, the exclusivity granted by the patent is only for a limited set of patents or patent applications in the area of amorphous and nanocrystaline glass-coated wires; the Institute retained the right to practice the inventions claimed in the ′591 Patent, and to grant licenses on any future improvements or applications containing "new matter" that resulted from that work.  GA25, ¶ 2.2; GA24, definition of "Licensed Patent."

Demodulation must allege facts that demonstrate that it owns the patent rights on which the infringement suit is based.  *Jim Arnold Corp. v. Hydrotech Systems, Inc.,* 109 F.3d 1567, 1571 - 1572 (Fed. Cir.  1997).  And that "allegation … must have a plausible foundation." *Id.*   At no time in this litigation has Demodulation asserted that it owned the Chiriac ′591 Patent.  Rather, it merely asserts that it has "held" the patents at issue.  Complaint, Docket No. 1 at ¶ 2; 1st Am. Complaint, Docket No. 9 at ¶ 2; 2d Am. Compl. Docket No. 19 at ¶¶ 2 & 56.

"[A] suit for infringement ordinarily must be brought by a party holding legal title to the patent." *AsymmetRx*, 582 F.3d at 1318.  And, by its terms, § 1498(a) limits recovery to the "owner" of a patent.  Further, since § 1498 is a waiver of sovereign immunity, it must be strictly construed in favor of the Government.  *Blueport Co. v. United States*, 533 F.3d 1374, 1378 (Fed.

Cir. 2008).  Accordingly, Demodulation bears the burden of establishing its right to sue for any

Government use of the ′591 patent.  *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed.

Cir. 2000) ("Speedplay must produce a written instrument documenting the transfer of

proprietary rights in the patents").

   As Demodulation concedes, it only has a license to the ′591 Patent.  Pl. Opp. at 1, 7.  It

argues, however, that it is still entitled to maintain this action because it possesses "all significant

rights" in the ′591 Patent.  Pl. Opp. at 8.  As explained below, Demodulation does not possess all

substantial rights and, as a mere licensee, is not the "owner" of the ′591 Patent.

## 2.   Demodulation Lacks Several Other Substantial Rights

   For over a century, courts have recognized that

> [t]he patentee or his assigns may, by instrument in writing, assign, grant, and
> convey, either (1) the whole patent, comprising the exclusive right to make, use,
> and vend the invention throughout the United States; or (2) an undivided part or
> share of that exclusive right; or (3) the exclusive right under the patent within and
> throughout a specified part of the United States. A transfer of either of these three
> kinds of interests is an assignment, properly speaking, and vests in the assignee a
> title in so much of the patent itself, with a right to sue infringers. In the second
> case, jointly with the assignor. In the first and third cases, in the name of the
> assignee alone. Any assignment or transfer, short of one of these, is a mere
> license, giving the licensee no title in the patent, and no right to sue at law in his
> own name for an infringement.

*Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).  Thus, the question is whether Demodulation

has an "assignment" of the ′591 Patent or a "mere license" that does not grant title to the

invention or the right to sue in its own name.  Whether a document conveys an assignment of the

patent or merely a license does not depend on the "name by which it calls itself, but upon the

legal effect of its provisions."  *Id.* (138 U.S. at 255-56.

   A patent "is, in effect, a bundle of rights which may be divided and assigned, or retained

in whole or part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875

19

(Fed. Cir. 1991).  Once the patent has been licensed, only the licensee or the licensor may be

"owner," not both.  *Id*.  As the Federal Circuit explained:

> [A] patent may not have multiple separate owners for purposes of determining
> standing to sue.  Either the licensor did not transfer "all substantial rights" to the
> exclusive licensee, in which case the licensor remains the owner of the patent and
> retains the right to sue for infringement, or the licensor did transfer "all substantial
> rights" to the exclusive licensee, in which case the licensee becomes the owner of
> the patent for standing purposes and gains the right to sue on its own.  In either
> case, the question is whether the license agreement transferred sufficient rights to
> the exclusive licensee to make the licensee the owner of the patents in question.
> If so, the licensee may sue but the licensor may not. If not, the licensor may sue,
> but the licensee alone may not.

*Alfred E.Mann Found. for Scientific Res. v. Cochlear Corp.*, 604 F.3d 1354, 1359-60 (Fed. Cir.

2010) (footnote omitted).

To be deemed the "owner" of a patent, one must own all substantial rights.  *Mann Found*.

604 F.3d at 1359.  An assignment conveys "title" to the invention.  There is no definitive list of

the terms or conditions that cause an agreement to be deemed an "assignment."  *Mann Found*.

604 F.3d at 1359-60.  Of necessity, the agreement must "transfer [] the exclusive right to make,

use, and sell products or services."  *Id*.  Other rights that have been deemed important to the

determination that an agreement is an "assignment" include:  the right to sublicense or reassign

the patent rights, reversionary rights following a breach, the party entitled to recovery for

infringement.  *Id*. at 1360-61.

The license agreement at issue here purports to grant exclusive rights in specified field.

The "License Grant" describes, *inter alia*, "the LICENSED INVENTION as limited to the

LICENSED AREA defined in Article 1."  GA25, ¶ 2.1.  And the Licensed Area is further

defined as "amorphous and noncrystalline glass coated wires."  GA25, ¶ 2.1.  While field of use

licenses can be exclusive for purposes of determining "ownership," to be able to sue a field of

use licensee must be the only one who can grant licenses, even to the exclusion of the licensor.

20

*Pratt & Whitney Co. v. United States*, 153 F. Supp. 409, 410 (Ct. Cl. 1957).  In *Pratt & Whitney* the Court of Claims noted that the exception for suit by licensees to sue under § 1498 was limited:

> The statute authorizing suits against the Government gives a right of action for use by the Government without a license.  Since plaintiff was the only one who could give it a license, it must be the person authorized to sue for use without a license.

*Id.* (citation omitted).

The right to sublicense others is one of the most significant of the "substantial rights" that courts look to in determining whether a licensee is the "owner" of a patent.  *Mann Found.*, 604 F.3d 1361-62.  An unfettered right to grant sublicenses is consistent with patent ownership.  *Id.* Further, an unfettered right to sublicense renders any retained right to sue illusory:  an accused infringer can frustrate the owner's ability to sue by obtaining a sublicense from the licensee.  *Id.* In this case, however, the license agreement only permits Demodulation to sublicense related entities.  GA30, ¶ 12.1.  Specifically, Demodulation can only transfer its rights to entities in which it owns or controls directly or indirectly at least 30% of the outstanding shares, stock or voting rights."  *Id.*

As becomes evident, Demodulation could does not meet the *Pratt & Whitney* criterion for "ownership."  Demodulation could not license or sublicense the Government.  Only the Institute had the ability to license the Government.

Retention by the licensor of the right to make and use the invention for its own purposes is also "substantial right," which will defeat a claim of ownership by the licensee.  *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1132-33 (Fed. Cir. 1995)).  In the license agreement, the Institute retained the right to make and use the invention.  GA25, ¶ 2.2.  It also retained the right to have others make and use the invention on its behalf.  *Id.*  Although

somewhat convoluted in its approach, the license agreement gives the Institute the right to

practice the licensed inventions and to retain any improvements or new inventions that it

develops.  GA25, ¶ 2.2; GA24, definition of "licensed patents."

The Licensed Invention is defined as "the invention defined by the claims of the

LICENSED PATENT and as may be further limited by Article 2."  GA24, defining "Licensed

Invention."  The Licensed Patent is further defined as including both domestic and foreign patent

applications and "corresponding:  reissue patents; modifications of said LICENSED PATENT

DOCUMENTS … (specifically excluding patent applications and patents containing new

matter)."  GA24, defining"Licensed Patent."  Thus, what the Institute retained is the right to

engage in continued use of the inventions by itself and through others (GA 25, ¶ 2.1) and the

right to make, use, sell or license its future work, *i.e.*, any patents or patent applications

containing "new matter," which are expressly excluded from the license grant by the definition

of "Licensed Patent."  GA24.   The Institute's retention of the right to practice the invention and

to retain (and license) any improvements is clear evidence that it is still the "owner" of the

invention.

Paragraph 2.1 also provides that the license is "terminable."  The conditions under which

the license may be terminated are found in Article 9 of the agreement.  Paragraphs 9.5 and 9.6

are of particular interest here.  Paragraph 9.5 provides that the license may be terminated by the

Institute if Demodulation "has failed or will fail to achieve and maintain PRACTICAL

APPLICATION of the LICENSED INVENTION as provided in Section 4.1," or "has failed or

will fail to reduce to practice" the invention.  The agreement defines "practical application" as:

> with respect to the LICENSED INVENTION, to reduce it to practice and to
> commercialize it, i.e., to manufacture it in the case of a composition or product, to
> practice it in the case of a process or method, or to operate it in the case of a
> machine or system; and in each case, under such conditions as to establish:  i) that

a market for the LICENSED INVENTION has been created …; ii) that it is being
utilized; iii) that its benefits are … available to the public on reasonable terms;
and iv) that market demand … shall be reasonably met.

GA25.  Section 9.5 also permits the Institute to terminate the license for failure to pay royalties

or to file required reports.  GA29.  And Section 9.6 permits the Institute to terminate the license

if Demodulation becomes "insolvent."  GA29.  These provisions also are consistent with the

granting of a license rather than ownership of the patent.

And Section 4.1 further requires:

LICENSEE shall achieve PRACTICAL APPLICATION of the LICENSED
INVETNION within twelve (12) months of the LICENSE COMMENCEMENT
DATE ….

and Section 4.2 requires that, once it achieved practical application under Section 4.1,

Demodulation was required to maintain practical application throughout the remainder of the

license term.  GA26.  Thus, Demodulation must continue to maintain commercial application if

it wishes to maintain the license.  If it does not maintain practical application, the license can be

terminated by the Institute. GA26, ¶4.2.  On information and belief, however, Demodulation has

not sold any commercial products in the ten years that the license has been in existence.  Thus,

the Institute would be free to terminate the license at any time.

When viewed as a whole, the agreement is merely a license, not a transfer of ownership.

As demonstrated above, the rights retained by the Institute are substantial.  In particular, there

has been no clear transfer of the right to sue for infringement or receive payment of damages for

such infringement.  And Demodulation's license could be terminated at any time.   The Institute

remains the "owner" of the ′591 patent for purposes of § 1498 and only it may bring suit for

infringement.

### 3.  Demodulation has neither pleaded nor established that it is the equitable owner of the ′591 Patent

As noted above, an equitable owner also may be entitled to compensation for government manufacture or use of the invention.  *Heinemann*, 620 F.2d at 877-878.  But Demodulation does not state any basis for equitable ownership.  Nothing in the Third Amended Complaint suggests that Demodulation has any equitable interest in the patent:  it is a mere licensee.  And the PTO assignment record suggests the opposite:  that the invention was conceived in Romania by four people who resided in that country.

Further, the plaintiff must allege facts that demonstrate that it owns the patent rights on which the infringement suit is based.  And the "allegation of ownership must have a plausible foundation."  *Jim Arnold Corp. v. Hydrotech Systems, Inc.,*109 F.3d 1567, 1571 -1572 (Fed. Cir. 1997).  Federal jurisdiction cannot lie based on allegations that are frivolous or insubstantial.).  Similarly, until Demodulation can establish its equitable or legal interest in the ′591 Patent, this Court lacks jurisdiction to hear its claim.


## IV.   CONCLUSION

For the reasons stated, the Government requests that this Court grant partial summary judgment in favor of the United States and against Demodulation that Demodulation cannot recover compensation for infringement of the following patents on or after the date specified:

(*i*)     For Patent No. 5,557,085 after September 17, 2013;

(*ii*)    For Patent No. 5,576,693 after November 19, 2013;

(*iii*)   For Patent No. 6,018,297 after  January 25, 2012;

(*iv*)    For Patent No. 6,137,411 after October 24, 2012;

(*v*)     For Patent No. 6,225,905 after May 1, 2013;

(*vi*)     For Patent No. 6,232,879 after May 15, 2013;

(*vii*)    For Patent No. 6,417,771 after July 9, 2010;

(*viii*)   For Patent No. 7,071,417 after July 4, 2010;

(*ix*)     For Patent No. 7,075,439 after July 11, 2010;

(*x*)      For Patent No. 7,233,249 after June 19, 2011;

(*xi*)     For Patent No. 7,354,645 after April 8, 2012; and

(*xii*)    For Patent No. 7,368,166 after May 7, 2012.

The Government also requests that the Court find that Demodulation cannot seek compensation for the use of United States Patent No. 6,270,591 since Demodulation is not the owner of that patent and it has not demonstrated that is has sufficient equitable interest in the ′591 Patent to maintain this action with regard to that patent.

                                            Respectfully submitted,

                                            STUART DELERY
                                            Assistant Attorney General

                                            JOHN FARGO
                                            Director

                                        *s/Gary L. Hausken*
                                          GARY L. HAUSKEN
                                          Assistant Director
                                          Commercial Litigation Branch
                                          Civil Division
                                          Department of Justice
                                          Washington, D. C.  20530
                                          Telephone:    (202) 307-0342
                                          Facsimile:    (202) 307-0345

May 9, 2014