**EXHIBIT # 2**

UNITED STATES
COURT OF FEDERAL CLAIMS

DEMODULATION, INC.,

                Plaintiffs,

- against –

CASE NO.:  1:11-cv-00236-TCW

USA,

                Defendants.

DECLARATION OF DR. JOHN H. HNATIO

THE MCKENNA LAW FIRM, LLC
96 Park Street
Montclair, New Jersey 07042
Tel: 973-509-0050
Fax: 973-509-3580
Attorneys for Plaintiffs

## BACKGROUND

1. I have many years of experience working both in the U.S. Government and industry in areas involving the transfer of U.S. Government funded technology to the private sector.

2. This experience includes the transfer of so-called "dual use" technologies that have both commercial, as well as, classified military and intelligence uses.

3. I have significant experience with the classification and the protection of sensitive national security information.

4. My curriculum vitae is attached at Exhibit A.

5. My Declaration required by the January 21, 2015, Order is attached at Exhibit B.

6. The Government has asserted its authority to withhold all information relating to the classified uses of plaintiff's microwire and microwire integrated products under the state secrets privilege.

7. Military and intelligence devices that infringe on the plaintiff's patents are classified by the U.S. Government at the top secret (TS), secret (S) and confidential (C) levels.

8. For example, on February 3, 2010, Senator Thomas Coburn wrote a letter to then Secretary of Energy, Stephen Chu, requesting a complete description of the work being done by the Department of Energy (DOE) involving the development, use and construction of microwire and microwire integrated devices. The letter is attached at Exhibit C.

9. On May 10, 2010, Brigadier General Harencak responded to Senator Coburn's February 3rd letter. The response failed to identify the broad range of work being done by the Department of Energy (DOE) across their production plant and laboratory complex on the use and construction of classified microwire and microwire integrated devices. In one example, DOE failed to disclose

the development and use of plaintiff's microwire technology to produce in situ pressure sensors for use in nuclear weapons. The letter is attached at Exhibit D.

10. More recently the U.S. Government did, in fact, divulge the existence of classified Government work to construct and use plaintiff's microwire and microwire integrated products for military and intelligence purposes. See ¶11 below.

11. In May of 2015, the Government provided five unclassified redacted reports to the plaintiff that in their original form are classified by the U.S. Government as containing secret information. One of the unclassified titles of the reports is, "In situ pressure sensors for monitoring the state of health for limited life components in nuclear weapons." The descriptive unclassified title of the report itself discloses that the Government is, in fact, developing, constructing and using plaintiff's microwire and microwire integrated devices to measure the pressure of gas in the limited life components used in nuclear weapons.

12. But even in this one instance, all information relating to the specific infringing devices being built and constructed for U.S. Government use was redacted as containing secret classified information.

13. Confronted with the Government's decision to assert the state secrets privilege, I was forced to rely on my knowledge of the U.S. military industrial complex, the intelligence agencies of the U.S. Government and forensic analysis techniques to "connect the dots" and identify infringing Government devices- all without any access to the classified information being withheld by the Government.

14. With absolutely no specific information forthcoming from the U.S. Government describing any classified infringed device, I was forced to determine what specific Government devices required the use of plaintiff's microwire and microwire integrated systems to optimize their performance to meet current U.S. military and intelligence needs. This work to "connect the dots" was grueling and took several hundreds of hours of collective effort.

15. My initial challenge was to find and analyze: a) specific scientific and technical reports relating to microwire; b) U.S. Government patents and licenses relating to microwire; c) internal Government agency funding and procurement documents relating to microwire and microwire integrated devices; d) congressional appropriations for the funding of microwire projects; e) internal production plant and laboratory reports on microwire, and; f) formerly classified but now declassified documents relating to the U.S. Government uses of microwire. Thousands of pages documents were uncovered owing to this exhaustive, burdensome search.

16. My next challenge was to apply forensic analysis techniques to "connect the dots" to identify a set of accused Government devices that scientifically and technically <u>must</u> use the plaintiff's microwire and microwire integrated products to optimize their performance to meet U.S. Government military and intelligence requirements. This task required that I scour through the thousands of uncovered pages to find written evidence to further support the claim of Government infringement for each accused device.

17. The above tasks were made inordinately more difficult because of the wide range of different terms being used by the Government to describe their uses of microwire. For example, I found at least 200 different terms used by Government to identify the different uses of microwire. The list is attached at <u>Exhibit E.</u>

18. The specific devices I confirmed as accused devices as the result of this arduous process are: a) U.S. Government Microwire product; b) U.S. National Security Agency (NSA) cell phones [associated with model / names: Gopherset: ANT prod. Data (software implant), Picasso (GSM Handset), Toteghostly 2.0, DropoutJeep, Monkey Calender, Totechaser]; c) NSA USB devices; d) NSA retroreflective devices; e) U.S. Department of Defense (DOD) devices for stealth; f) U.S. Navy (USN) fluxgate magnetometers g) USN and U.S. Army tracking of conventional military ordnance and DOE tracking of nuclear weapons h) U.S. Army guidance and precision detonation of munitions i) U.S. Department of Energy (DOE) strain sensors; j) DOE devices for the chemical sensing of explosives; k) anti-counterfeiting of documents, currency and credentials, and; l) passive microwire enhanced Radio Frequency Identification Devices (PRFID) used by the Government. See <u>Exhibit F.</u>

19. My final challenge was to coordinate a scientific peer review of the technical descriptions of the accused devices to demonstrate the specific claims infringed by the Government. This required close coordination with other members of the plaintiff's team of scientists and engineers.

20. In many past cases, when the U.S. Government has asserted the state secrets privilege it has proven to be insurmountable. Application of the privilege results in exclusion of evidence from a legal case based solely on affidavits submitted by the Government stating that court proceedings might disclose sensitive information which might endanger national security.

21. *United States v. Reynolds*, 345 U.S. 1 (1953), which involved military secrets, was the first case that saw formal recognition of the privilege. In *United States v. Reynolds*, following a claim of "state secrets privilege", the Court did not conduct an *in camera* examination of the evidence to evaluate whether there was sufficient cause to support the use of the doctrine.

22. This resulted in a court ruling in which even the judge was unable to ascertain the veracity of the assertion. The privileged material was completely removed from the litigation, and the Court was left to determine how the unavailability of the privileged information affected its judgement.

23. It was not until September 10, 2015, that I was retained by the McKenna Law Firm, LLC to serve as a consulting expert on the Demodulation matter and asked to craft a strategy to challenge, in the interests of justice, the Government's assertion of the state secrets privilege in the case of Demodulation.

24. To my knowledge any attempt to challenge the assertion of the state secrets privilege without access to the classified information being withheld by the Government is a rare, if non-existent, course of action that requires a wholly new mindset, the application of forensic analytical techniques and insights into the workings of the U.S. Government.

25. Finally, it was not until February 4, 2016, that I was able to conclude, based on the cumulative evidence provided to the Government by Mr. Anthony Cantonese, that there now exists reasonable cause to believe that the U.S. Army and the National Security Agency did, in fact, mount an

intelligence operation to develop a device using the plaintiff's microwire product to enhance the guidance and accurate detonation of precision guided munitions. See <u>Exhibit G</u> for a technical description of the accused device.

26. A copy of a certification provided by Mr. Anthony Cantonese confirming the intelligence operation involving the U.S. Army and the National Security Agency is attached at <u>Exhibit H.</u>

27. This evidence was in the custody of the defense but not released nor discussed with me in spite of a specific request by Mr. Canotnese that Government counsel directly contact me to review the matter. See <u>Exhibit I.</u>  I was never contacted by Mr. Hausken.

28. The conduct of intelligence operations mounted by the U.S. intelligence community to secretly and intentionally misappropriate the private property of U.S. citizens is among the most egregious offenses in a nation guided by the principles of our Constitution.

## **CERTIFICATION**

29. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Dr. John H. Hnatio
Dated:  February 12, 2016

## **LIST OF EXHIBITS**

Exhibit A:  Curriculum vitae of Dr. John Hnatio

Exhibit B:  Dr. Hnatio's Declaration as required by the January 21, 2015, Order

Exhibit C:  Letter from Senator Thomas Coburn to Secretary of Energy Chu

Exhibit D:  Department of Energy response to Senator Coburn

Exhibit E:  Listing of U.S. Government related terms for Microwire

Exhibit F:  Technical descriptions of accused Government devices

Exhibit G: Device using the plaintiff's microwire product to enhance the guidance and accurate detonation of precision guided munitions

Exhibit H: Certification of Mr. Anthony Cantonese

Exhibit I:  Note from Mr. Cantonese to U.S. Government Counsel Hausken